# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:23CR65-CMH |
| | ) | |
| JAMES MEEK. | ) | |

## DEFENDANT'S MOTION TO COMPEL DISCLOSURE
## OF *BRADY* AND RULE 16 MATERIAL

James Gordon Meek, through counsel, respectfully asks this Court to order the government to comply with its obligations under Fed. R. Crim. Proc. 16 & 5(f),[1] as well as *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.  The government's full compliance with its Rule 16 and *Brady* obligations is necessary in order for Mr. Meek to present a complete defense, including filing pretrial motions.  The government should be ordered to respond to this motion no later than April 27, 2023, so that Mr. Meek may timely file his pretrial motions by May 4, 2023.  In support of this motion, Mr. Meek states as follows:

## BACKGROUND

### A.  Mr. Meek's background.

For over 30 years, Mr. Meek has worked as an investigative journalist, most recently with ABC News. In that time, Mr. Meek has reported on issues relating to criminal justice, national security, government corruption, war, hostages, torture, human rights abuses, terrorism, and other issues of national and international significance. Mr. Meek has been recognized for his work,

---

[1]       *See also* E.D. Va. July 12, 2021 Standing Order Regarding Rule 5(f).

including being nominated for six Emmy Awards for his investigations, one of which he won in 2017.[2] He has been the recipient of multiple other awards.[3]

Much of Mr. Meek's work as an investigative journalist has focused on coverups, abuses of power, and other wrongdoing by the United States government, including the Pentagon, the Department of Justice ("DOJ"), and the FBI.  For example, in March 2021—the time that this investigation allegedly began—Mr. Meek was investigating and writing about several matters involving the FBI and the DOJ, including:

- ***Robert Levinson***.  Mr. Levinson was a retired FBI agent held hostage in 2007 and believed to have died in captivity in Iran.  Mr. Meek reported on missteps by the US government, including the FBI, in recovering the hostage.[4]

- ***Mark Frerichs***.  Mr. Frerichs was a civil engineer kidnapped in Kabul in 2020 and held hostage by the Taliban for two and a half years.  Mr. Meek aided Mr. Frerichs' family, who had lost faith in the government (including the FBI) to secure the release of Mr. Frerichs by giving his family a platform to plead with President Biden to save her brother before the US exited Afghanistan in 2021.[5]

- ***The 2017 ISIS Ambush of Green Beret Team in Niger***.  Mr. Meek spent four years investigating the ambush of a US team of Green Berets who were accused of going on a rogue mission prior to the attack.  Mr. Meek's reporting exposed that the Pentagon's claims about this attack were false.  The FBI had a concurrent, publicly announced investigation

---

[2]     *See* https://www.imdb.com/name/nm8229289/awards (Emmy nominations and awards).

[3]     These include the Overseas Press Club Award (2021), Society of Professional Journalists Awards (2016 and 2018).

[4]     *See, e.g.*, James Gordon Meek, No body, no burial, no peace for Iran hostage Bob Levinson's family, ABCNews.com, https://abcnews.go.com/US/body-burial-peace-iran-hostage-bob-levinsons-family/story?id=76376460 (March 11, 2021) (last visited April 19, 2023); James Gordon Meek, Documents may be breakthrough in case of FBI veteran Robert Levinson, who vanished in Iran, ABCNews.com, https://abcnews.go.com/International/documents-breakthrough-case-fbi-veteran-robert-levinson-vanished/story?id=67169441 (Nov. 21, 2019) (last visited April 19, 2023).

[5]     *See, e.g.*, James Gordon Meek, Hope dims for American hostage as US hastily exits Afghanistan, ABCNews.com, https://abcnews.go.com/US/hope-dims-american-hostage-us-hastily-exits-afghanistan/story?id=78291489 (June 19, 2021) (last visited April 19, 2023).

of the incident, and was well aware of Mr. Meek's investigation reporting on this issue between 2017 and 2021.[6]

▪ ***Jeffery Woodke***.  The Pentagon also falsely claimed that the Green Beret team ambushed in 2017 had gone rogue to help recover Mr. Woodke, an American Christian aid worker kidnapped in 2017 by ISIS.  Mr. Woodke's six-year captivity was an open FBI case, but his family eventually clashed with the FBI over their inability to secure Mr. Woodke's release.  Both Mr. Woodke's case and the 2017 ambush of the Green Beret team were the subjects of an Emmy-nominated documentary about Mr. Meek's investigations.[7]

Not all of Mr. Meek's reporting has been critical of the government, and in some cases, Mr. Meek used his sources, relationships and reporting to assist the government.  For example, Mr. Meek facilitated the government obtaining critical evidence against two ISIS suspects later convicted of torturing and murdering American citizens in Syria, who were prosecuted in the Eastern District of Virginia.  Mr. Meek covered the trial of one of the defendants in that case.[8]

In August 2021, Mr. Meek contributed to saving the lives of more than 700 Afghan refugees (which consisted almost exclusively of US-trained Afghan partner forces, their wives, and children), including four US citizens, by creating a veterans' volunteer group that shepherded them out of Kabul in the wake of the Biden Administration's chaotic withdrawal from Afghanistan.

---

[6]     *See, e.g.*, James Gordon Meek, Vets ask Pentagon leader to take new look at Niger probe after '3212 Unredacted' film, ABCNews.com, https://abcnews.go.com/Politics/vets-pentagon-leader-niger-probe-3212-unredacted-film/story?id=81779515 (December 16, 2021) (last visited April 19, 2023); James Gordon Meek, US soldiers killed in Niger were outgunned, 'left behind' in hunt for ISIS leader, ABCNews.com, https://abcnews.go.com/International/us-soldiers-killed-niger-outgunned-left-hunt-isis/story?id=54909240 (May 3, 2018) (last visited April 19, 2023).

[7]     *See, e.g.*, James Gordon Meek, ABC News documentary challenges Pentagon's claims of rogue Green Berets, ABCNews.com, https://abcnews.go.com/International/abc-news-documentary-challenges-pentagons-claims-rogue-green/story?id=80695861 (Nov. 13, 2021) (last visited April 19, 2023).

[8]     Mr. Meek also routinely worked with the FBI and other agencies to safeguard the homeland between 2011 and 2013 as Senior Counterterrorism Advisory to the US House Committee on Homeland Security.

At the time of the FBI raid of his residence in April 2022, agents noted that Mr. Meek had just completed work on a book he co-authored that details this operation.[9] Lt. Col. Scott D. Mann, OPERATION PINEAPPLE EXPRESS: THE INCREDIBLE STORY OF A GROUP OF AMERICANS WHO UNDERTOOK ONE LAST MISSION AND HONORED A PROMISE IN AFGHANISTAN (Simon & Schuster, 2022). That book, which was highly critical of the Administration's handling of the evacuation of Afghanistan, became an instant New York Times best seller after its release in August, 2022.

**B. The government's investigation.**

The government has alleged that it became involved in this investigation after receiving a referral from the Arlington County Police Department ("ACPD") on September 7, 2021.[10] According to the government, the investigation originated when Dropbox "found" child sexual abuse materials in an account belonging to Mr. Meek. *See* Exhibit 1—April 22, 2022 Sealed Affidavit in Support of Search Warrant for Residence and Electronic Devices, ¶ 7.[11] According to the government's representations, Dropbox reviewed five videos that were located on the account,

---

[9]     Upon learning that he was under investigation, Mr. Meek notified his co-author and publisher, and had his name and most details of his involvement removed from the book prior to its publication. He did this in order to avoid bringing negative attention to the important and heroic stories of those involved. A prior draft of the book, which was set for publication by Simon & Schuster, can be provided to the Court under seal.

[10]     Numerous FBI reports provided in discovery contain a preamble stating that "On 03/11/2021 the National Center for Missing and Exploited Children NCMEC received a tip from Dropbox, Inc. regarding an allegation of sexual abuse of a minor. On 09/07/2021 Arlington Police Department forwarded this tip to the FBI Washington Field Office. Dropbox, Inc. reported that an individual uploaded 6 files containing Child Sexual Abuse Material (CSAM). Dropbox, Inc. provided the following subscriber information for the account . . ." 9/10/21 FBI FD-1057, Bates number US-00000845.

[11]     Because this document is sealed, it is filed under seal with a contemporaneous motion to unseal a redacted version.

and then sent a CyberTip to the National Center for Missing and Exploited Children ("NCMEC") on March 11, 2021.  NCMEC then forwarded the tip to the Virginia State Police ("VSP").

The VSP served subpoenas on Verizon and Google (but apparently not Dropbox) in June of 2021.  Ex. 1 at ¶¶ 8-12.  Then, at some unknown point and for unknown reasons, the case was referred by the VSP to the ACPD.  It is not clear what investigation the ACPD conducted before it allegedly referred this matter to the FBI in September of 2021.  At some point, an FBI agent then reviewed the five videos that were reported by Dropbox to NCMEC in March 2021 and concluded that they are in fact child sexual abuse materials ("CSAM.").  *Id*. at ¶ 17.

All of the warrants obtained by the government—including the warrant that authorized the search of Mr. Meek's residence and all of the electronic devices therein—were based entirely on CSAM that Dropbox is alleged to have discovered on March 10, 2021.

**C. The government's claims at Mr. Meek's detention hearing.**

On February 1, 2023, Mr. Meek had his detention hearing before a magistrate judge.  After he was ordered released on conditions, the government sought a *de novo* hearing before the district court.   In support of its argument for detention, government claimed (as it did before the magistrate) that Mr. Meek was a threat to himself because he stated during the search that his "life was over."  *US v. Meek*, 1:23MJ32, ECF 26, United States' Motion for Revocation of Release Order ("The defendant may also pose a danger to himself. When law enforcement searched his home, he told them that his life was over."); *US v. Meek*, 1:23MJ32, ECF 31, Transcript of detention hearing at 12 ("Special Agent Griffith, the comment about the life being over. Was that made at the time of arrest?").  Yet, when the government finally provided the audio of Mr. Meek's statement at the time of the search—only after the detention hearing took place—it became clear

that Mr. Meek never said any such thing.  The government thus made an argument that was simply false—whether through recklessness or otherwise.

But this is not all.  The government claimed that based on its interviews of an individual identified in the affidavit supporting the arrest warrant as IDENTIFIED MINOR 2, whom Mr. Meek is alleged to have communicated with through Snapchat, that individual informed Mr. Meek that she was a minor at the time.  But the government failed to mention that the individual interviewed made multiple contradictory statements when claiming to identify Mr. Meek, and that its examination of the electronic devices seized failed to yield any evidence that this individual stated her age.  The individual also made statements about Mr. Meek's specific location at a specific time as being in St. Louis, when Mr. Meek has never been to St. Louis—a fact that the government must have known because it spent substantial time investigating his travel records. The government also failed to disclose that the individual at issue was sending nude photos of herself to multiple people, posting them publicly on her Snapchat stories to her numerous followers, and tagging public figures in the posts.  The government likewise failed to disclose that one of this individual's usernames on Snapchat had the number "19" next to her name.  In sum, but for the individual's unsupported claim that that she informed Mr. Meek that she was a minor years before, and alongside multiple contradictory statements, the government had no evidence that Mr. Meek would have known that she was a minor.  Indeed, we now have an indictment— months later—that does not contain a single word about Mr. Meek knowingly contacting a child. Yet, the government boldly argued at the detention hearing that "the fact is that online exploitation, what we've seen Mr. Meek engaging in, he's the original abuser there. He is an original victimizer. It is not just if he had met up with someone in person. So it sounds like you understand that. I appreciate that, Your Honor." *Id.* at 34.

While there is no way to redress[12] the claims that the government made at Mr. Meek's detention hearing, this Court must ensure that the government is strictly held to its disclosure obligations, which bear on Mr. Meek's constitutional rights, including the right to present a defense.

### C. The press leaks relating to the investigation of Mr. Meek.

More troubling still, months prior to Mr. Meek's arrest and the public disclosure of the charges against him, the press began reporting on the details of the government's investigation of Mr. Meek—details that could only have been known by an individual or individuals with access to the government's confidential investigation of Mr. Meek.[13]  On October 19, 2021 for example, Rolling Stone broke the first story relating to the investigation of Mr. Meek, at that time reporting that Mr. Meek was suspected of possessing classified documents.[14]  The FBI's internal documents and communications in the wake of the raid, disclosed to defense counsel only after Mr. Meek was charged, revealed that the government planned to investigate its suspicions that Mr. Meek

---

[12]    Mr. Meek'ss appeal of the district court's detention order is pending before the Fourth Circuit.  In the meantime, until recently, Mr. Meek spent nearly three months in administrative segregation and the Alexandria Detention Center, which entails being locked down in a solitary cell 22 hours a day.

[13]    We do not suggest here that the line prosecutors in this case are responsible for the press leaks.  Indeed, on November 2, 2022 undersigned counsel raised the issue with the AUSAs of record and their supervisor, Seth Schlessinger.  The line prosecutors expressed disapproval of the leaks and stated they had no knowledge of who was responsible, but said nothing more on the issue.

[14]    Tatiana   Siegel,   FBI   Raids   Star   ABC   News   Producer's   Home, https://www.rollingstone.com/politics/politics-features/fbi-raid-abc-news_producer-1234613619/ (Published Oct. 19, 2022 and updated Oct. 22, 2022) (last accessed April 19, 2023); Rolling Stone later published another story about the forthcoming charges against Mr. Meek, approximately a month prior to his arrest in this case—an arrest that came as a complete surprise to both Mr. Meek and the undersigned counsel. Tatiana Siegel, DOJ Preps Charges Against Former ABC News Producer,   Rolling   Stone,   https://www.rollingstone.com/politics/politics-features/former-abc-news-producer-james-meek-doj-preps-charges-1234646196/ (Dec. 22, 2022) (last accessed April 19, 2023).

possessed classified documents.  But as revealed in subsequent reporting, Rolling Stone magazine

also knew at the time it published its original story that Mr. Meek was under investigation for child

pornography offenses.[15]  And Rolling Stone was not alone in this knowledge.  For example, on

October 19, 2022, Congresswoman Marjorie Taylor Greene tweeted about the raid, stating that

"sources" had informed her that Mr. Meek was being investigated regarding alleged child

pornography on his laptop.[16] Thus, both the media story and Congresswoman Greene relied upon

unidentified "sources" for their information.

As will be discussed below, the issue of press leaks is related directly to Mr. Meek's right

to the disclosure of exculpatory evidence, which includes evidence of bias by individuals

employed by the agencies that were then investigating him and are now prosecuting him.

**ARGUMENT**

**I.    Information relating to Dropbox.**

The affidavit in support of the warrant authorizing the search of Mr. Meek's residence, and

all of the digital devices in that residence, contains only a brief description of what triggered the

investigation of Mr. Meek: "The investigation was initiated from an investigative lead sent to the

Washington Field Office's Child Exploitation and Human Trafficking Task Force. The lead stated

that on March 11, 2021, Dropbox filed a CyberTip with the National Center for Missing and

Exploited Children (NCMEC) regarding child pornography found in a Dropbox account on March

10, 2021. The CyberTip reported that a Dropbox account user had uploaded five videos to Dropbox

---

[15]    David Folkenflik, NPR, The FBI raided a notable journalist's home. Rolling Stone didn't tell readers why, https://www.npr.org/2023/03/21/1164360143/rolling-stone-fbi-raid-journalist-james-gordon-meek (March 21, 2023) (last accessed April 19, 2023).

[16]    *https://twitter.com/RepMTG/ status/ 1582845216419352576?s=20&t=YRZHfPO-ZcVHJW_qYsn9fA* (last accessed April 3, 2023).

that were later confirmed by law enforcement to contain child pornography. The username associated with the account was "James Meek," and the CyberTip contained IP addresses that were subsequently determined to be assigned to MEEK, at an address in Arlington, VA (MEEK's RESIDENCE)."  Ex. 1 ¶ 7.

The affidavit fails to provide any specifics as to how Dropbox "found" the alleged CSAM materials at issue on the account, what prompted Dropbox to search for such materials, who at Dropbox was involved in the search and review (if any) of the materials, and other important details regarding the origin of this investigation.  The materials disclosed in discovery, although voluminous, fail to provide any details on this issue.  This is no minor omission—the legality of the government's seizure in this case hinges entirely on the circumstances under which Dropbox allegedly discovered the child sexual abuse materials ("CSAM") it reported to NCMEC, and exactly what Dropbox did with those materials.

In order to address the legality of the warrants obtained by the government in this case, the defense has requested that the government disclose the details of Dropbox's alleged discovery of the CSAM materials on the account, including what prompted the search, how the files were located, and the identity of the Dropbox employee who allegedly located and reviewed the files before making a referral to NCMEC.  *See* Exhibit 2 (Defense discovery letter dated February 24, 2023); Ex. 3 (Government response letter dated March 16, 2023); Ex. 4 (Defense follow-up discovery letter dated March 31, 2022 [sic] (letter sent on March 31, 2023)); and Ex. 5 (Government response letter dated April 7, 2023).  The government has chosen to ignore these requests.  *Compare* Ex. 4 at 5-6, and Ex. 5 at 4.

The details of Dropbox's discovery of the CSAM materials forwarded to NCMEC are central to whether the warrants obtained by the government are valid.  For example, if there was

law enforcement involvement in the search of the Dropbox account, then this was a warrantless search outside the scope of the private search doctrine.  *See, e.g.*, *Skinner v. Ry. Labor Executives′ Ass′n*, 489 U.S. 602 (1989) (holding that a private party's search is attributable to the government "if the private party acted as an instrument or agent of the Government."); *United States v. Hardin*, 539 F.3d 404, 419 (6th Cir. 2008) (finding a search illegal where the police "instigated, encouraged or participated in the search" and the private citizen "engaged in the search with the intent of assisting the police in their investigative efforts."); *Cf. United States v. Richardson*, 607 F.3d 357, 366 (4th Cir. 2010) (holding that AOL's scanning of email communications for child pornography and reporting discoveries to NCMEC did not trigger the Fourth Amendment's warrant requirement because no law enforcement officer or agency asked the provider to conduct the search).

Additionally, there is no dispute that the FBI played the videos contained in the five files provided by Dropbox to NCMEC and then to the FBI, and did so without a warrant.  A warrantless seizure is "*per se* unreasonable . . . subject to only a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357 (1967).  The search in this case would only be valid if an exception applies—in this case the private search exception.  The government bears the burden to prove that this exception applies and that the search was legal. *See Nix v. Williams,* 467 U.S. 431, 444 (1984); *United States v. Mendenhall,* 446 U.S. 544 (1980).

In this case, the government must prove that an employee of Dropbox actually opened and played the entirety of the five video files that the FBI viewed.  *See, e.g., United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021)  (finding that law enforcement exceeded the scope of a private search by Google when opening emails and files that a Google employee did not previously view); *United States v. Ackerman*, 831 F.3d 1292, 1294 (10th Cir. 2016) (Gorsuch, J.) (holding that NCMEC was a government actor or agent of the government that conducted a warrantless search by reviewing

email attachments that were reported but not previously opened by AOL). The leading Supreme Court decision in *Walter v. United States,* 447 U.S. 649 (1980), is in point: in that case, a third party had opened a misdelivered package containing what was alleged to be a pornographic film, and referred the matter to law enforcement based upon markings and on holding the film stock up to the light view the images. Nevertheless, the Court held that the subsequent viewing of the film by projecting it on a screen, without a warrant, was an unlawful search violating the Fourth Amendment. *Walter,* 447 U.S. at 656-60. Similarly here, the precise circumstances of Dropbox's activities will show whether the "private search" doctrine is applicable at all—or whether Dropbox was acting as an agent for the government—and whether the limitations on the scope of that doctrine have been observed, or, as in *Walter*, exceeded.

*Brady* and its progeny require the government to disclose information that is material to, *inter alia*, suppression. *See, e.g., United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) (*Brady* violated in pretrial context by suppression of report that would have demonstrated that defendants had Fourth Amendment standing to challenge search); *Nuckols v. Gibson*, 233 F.3d 1261, 1266-67 (10th Cir. 2000) (*Brady* violation when government failed to disclose allegations of theft and sleeping on the job of police officer whose testimony was crucial to the issue of whether a *Miranda* violation had occurred—and thus, crucial to the admissibility of the confession); *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992) (nondisclosure of *Brady* information may have affected fact finder's findings at the suppression hearing); *See United States v. Barton,* 995 F.2d 931, 935 (9th Cir.1993) ("[W]e hold that the due process principles announced in *Brady* and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant.").

*Brady* material is not limited to information that is reduced to writing, but also requires disclosure of matters that were never documented.[17]  *See, e.g., United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007).  Nor is *Brady* information limited to evidence that is admissible. *See, e.g., Ellsworth v. Warden*, 333 F.3d 1 (1st Cir. 2003); Justice Manual § 9-5.001.C.

Further, the government's obligation to disclose *Brady* material is not limited to information that is within the possession of the DOJ and the FBI, but includes information in the possession of other agencies[18] that were involved in the investigation of Mr. Meek in connection with this matter.  *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (holding that an item is within "the government's" possession, custody, or control if it is in the possession, custody, or control of the prosecutor's office, or an instrumentality of the federal government that participated in the investigation or otherwise was "closely aligned with the prosecution.") (quoting *United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985)); *United States v. Safavian,* 233 F.R.D. 12 (D.D.C. 2005).  The prosecution has a non-delegable duty to take steps to search for exculpatory information.  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). It is "the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team." Justice Manual 9.5001.B.2.  This includes

---

[17]     The government's representations to the defense strongly suggest that members of the prosecution team failed to document important facts and events in this investigation, including how the FBI came to be involved.  In response to requests for documents reflecting communications between the State and local police and the FBI regarding this matter, the government suggested that not all such communications were documented.  *See* Ex. 5 ("We note that your presumption, present throughout your letter, that certain records must exist appears to be premised on the unsupported and faulty assumption that records and information can only be transmitted via email or other written form. In fact, records and information are regularly transmitted in person or orally, among other means.").

[18]     As discussed below, the Virginia State Police and the Arlington County Police Department are part of the prosecution team.

"federal, state and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant." *Id*

The government is not permitted to withhold potential *Brady/Giglio* information based on its own, unilateral judgment that the information is "not material." Citing *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999)*,* the Fourth Circuit has stated that "a prosecutor is obliged to disclose any material favorable to an accused" even though "[it is] not implying that the prosecution committed a *Brady* violation in failing to disclose [the favorable evidence]" because "a *Brady* violation requires the suppression of exculpatory material to have affected the outcome of the trial." *Monroe v. Angelone*, 323 F.3d 286, 290 n.3 (4th Cir. 2003) (emphasis added). *See also United States v. Danielczyk*, No. 1:11CR85 JCC, 2013 WL 142460, at *2 (E.D. Va. Jan. 10, 2013) ("the aforementioned definition of 'materiality' discussed in *Bagley, Strickler*, and other appellate cases is a standard articulated in the post-conviction context for appellate review. In this pretrial setting '[t]he government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed, with the benefit of hindsight, affecting the outcome of the trial.'") (quoting *United States v. Safavian*, 233 F.R.D. at 16); *see also United States v. Sudikoff*, 36 F. Supp. 2d 1196 (C.D. Cal. 1999) ("[I]n the pretrial context it would be inappropriate to suppress evidence because it seems insufficient to alter a jury's verdict . . . Thus, the government is obligated to disclose all evidence relating to guilt or punishment which might reasonably be considered favorable to the defendant's case.").

If there was no law enforcement involvement in the search of the Dropbox account, the government could have said so. Alternatively, the government could have stated what prompted Dropbox's search in its search warrant affidavit, or simply disclosed the matter to the defense.

Instead, the government has chosen to stay silent on his issue.  The government must now be compelled to disclose this information in accordance with its *Brady* obligations.

**II.    Documents relating to the investigation by the Virginia State Police and the Arlington County Police Department.**

The VSP and the ACPD were involved in the investigation that led to the charges against Mr. Meek.  Discovery provided by the government reflects that NCMEC initially forwarded the CyberTip submitted by Dropbox to the VSP, and that the VSP then investigated the case by issuing subpoenas to Verizon and Google.  At some unknown point, and for unknown reasons, the case was referred to ACPD.  Then, according to the FBI's internal reporting, the case was referred by ACPD to the FBI in September of 2021, almost six months after the initial CyberTip.

Both the VSP and ACPD are part of the prosecution team in this case.  The government relied on the investigative steps taken by these agencies to support the search warrant applications it sought and obtained in this Court.  Furthermore, members of the ACPD participated in the search of Mr. Meek's residence in April of 2021.  After this, the ACPD, in coordination with the FBI, conducted interviews of Mr. Meek's daughter and ex-wife in the period following the search of his residence.  The ACPD also carried out other investigative tasks in coordination with the FBI. Both agencies assisted and were closely aligned with the FBI in this matter.

The documents in the possession of VSP and ACPD are critical to Mr. Meek's defense, including but not limited potential suppression issues.  As such, they must be produced under Rule 16, which requires the disclosure of any document or object that is "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).  Demonstrating materiality "is not a heavy burden." *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993). Material evidence is not limited to that which is exculpatory, as the defendant should be "aware of both the potential pitfalls and the

strengths of his defense strategy." *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998) (brackets and internal quotations omitted).

As with the *Brady* context, under Rule 16 a document or object is deemed within the government's possession, custody, or control if a federal or local law enforcement agency that participated in the investigation possessed or controlled it. *See United States v. Scott*, 2006 U.S. Dist. LEXIS 30510 at * 9, No. RDB 05-0550 (D. Md. May 4, 2006) (finding a letter possessed by the Baltimore City Police Department to be within the "government's possession, custody or control" based on the close working relationship between the Baltimore City Police Department and the federal government in this case); *United States v. Jordan*, 316 F.3d 1215, 1249-50 (11th Cir. 2003) ("courts have found that the 'possession, custody, or control of the government' requirement includes materials in the hands of a governmental investigatory agency closely connected to the prosecutor.").

Yet, despite the fact that the VSP and the ACPD were part of the prosecution team, it is apparent that not all documents relating to the investigation by these agencies have been provided to the defense.  There are only a handful of documents relating to both of these agencies, and there are obvious gaps given what the FBI claims has happened.  For example, there are no documents reflecting VSP's referral of this matter to the ACPD.  It strains credulity that there would be no written record of any kind reflecting this event.  There are no documents regarding any of ACPD's investigative activities prior to the ACPD's referral of this case to the FBI in September of 2021. With respect to the referral itself, while the FBI documents note in general terms that the matter was referred by the ACPD on September 7, 2021, no written records from ACPD documenting the referral have been produced.  Moreover, while the defense has received some documents relating to the VSP's investigation (VSP's subpoenas to Google and Verizon and the respective subpoena

returns), there is no record of how or when these few records were transmitted to the ACPD and ultimately to the FBI and the DOJ, which subsequently relied on these documents in the search warrant applications.  This is significant, because the information provided by Verizon and Google is evidence in the case, for which investigators are expected to maintain a chain of custody.

The foregoing materials fall within the scope of the government's Rule 16 obligations.  The government should be ordered to disclose all documents (including reports, emails, text messages, and any other materials) relating to the investigation of Mr. Meek.

## III.   Filter team memoranda and other information relating to the government's filter procedures, and approval of the search of Mr. Meek's residence and electronic devices.

In its search of the electronic devices seized from Mr. Meek's residence, the government accessed Mr. Meek's newsgathering materials, including communications, sensitive confidential sources, and work product.  The government stated that it employed filter procedures while carrying out these searches.  The discovery materials reference filter team memoranda dated November 24, 2021 and April 22, 2022.  The defense has requested copies of these memoranda, Ex. 4 at 6, but the government has refused to provide them, claiming that they are work product and that, in any event, Mr. Meek has no reporter's privilege because no such privilege exists.   Ex. 5 at 5.  Mr. Meek has also requested documentation relating to requests to, and approvals by, senior DOJ officials[19] in connection with the search warrant applications in this case or any other

---

[19]    *See* Ex. 6, Annual Report: Department of Justice Use of Certain Law Enforcement Tools to Obtain Information from, or Records of, Members of the News Media; and Questioning, Arresting, or Charging Members of the News Media (Year 2021).  The publicly available report indicates that in 2021, the Deputy Assistant Attorney General authorized a search warrant for an online account of a journalist in connection with a child exploitation investigation.  The same report also states that "the Assistant Attorney General for the Criminal Division authorized the issuance of a grand jury subpoena to a news media entity in order to obtain IP address information for computers that accessed a particular online news article during a specified narrow timeframe."  The government has provided no records reflecting the latter investigative activity by the FBI, and

investigative steps in this case. Ex. 4 at 7.  The government has refused to produce this material. Ex. 5 at 5.

The government's own policies and actions belie its position that Mr. Meek's newsgathering materials are entitled to no protection.  If this were true, then why did the government claim to implement filter procedures?  Additionally, why did the FBI agents at the search ask Mr. Meek to identify devices containing newsgathering materials? The DOJ's own policies reflect the recognition that newsgathering materials are entitled to protection: "The Department recognizes the important national interest in protecting journalists from compelled disclosure of information revealing their sources, sources they need to apprise the American people of the workings of their Government." 28 C.F.R. § 50.10(a)(2).  To be sure, the DOJ's policies provide more protection in circumstances where newsgathering activities are the subject of investigation, but the need to protect such information is recognized by the DOJ even in instances where the investigation is unrelated to newsgathering activities.  *See, e.g.*, 28 C.F.R. § 50.10(d)(2) (requiring authorization of Deputy Assistant Attorney General for the Criminal Division prior to issuing compulsory process to a member of the media for conduct unrelated to newsgathering); 28 C.F.R. § 50.10(o)(4) ("Members of the Department should consult the Justice Manual for guidance regarding the use of filter protocols to protect newsgathering-related materials that are unrelated to the conduct under investigation.").

Recognizing that Mr. Meek's newsgathering materials were entitled to some level of protection, there are significant questions as to whether the government's search was reasonable in the context of this case.  Under the Fourth Amendment, "all searches and seizures must be

---

more generally has provided no records relating to requests to, or authorizations by, senior DOJ in connection with this investigation.

reasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011).  Fourth Amendment "[r]easonableness

has many dimensions." *United States v. Lyles*, 910 F.3d 787, 795 (4th Cir. 2018).  The fact that Mr.

Meek was an investigative reporter whose work covered the government, including the agencies

that rummaged through his newsgathering documents and communications, is relevant to

determining whether the search authorized and conducted in this case was reasonable.  *See, e.g.*,

*In re Grand Jury Subpoena: Subpoena Duces Tecum*, 829 F.2d 1291, 1299–300 (4th Cir. 1987)

("When governmental searches trench on first amendment concerns, courts have been careful to

scrutinize the searches much more closely than the district court did in this case."). These questions

include whether the protocols employed in the search were reasonable,[20] how the scope of the

searches was justified to senior DOJ officials,[21] and whether those protocols were actually

followed.

　　　In order to appropriately assert his Fourth Amendment rights, Mr. Meek is entitled to know

what the filter protocol was in this case and whether that protocol was followed.  If the government

is not compelled to produce the filter memoranda, then the Court should hold an evidentiary

---

[20]　　The government was obligated to use the least intrusive means to search the electronic
devices seized.  *See, e.g.*, Justice Manual 9-13.400.D.7 (" . . . investigators should use protocols
designed to minimize intrusion into potentially protected materials or newsgathering activities
unrelated to the investigation, including but not limited to keyword searches (for electronic
searches) and filter teams. 28 C.F.R. 50.10(d)(7). Members of the Department should include
proposed search and review protocols in their requests for authorization.").  Given that the
investigation was purportedly focused on CSAM, which is limited to a "visual depiction" of minors
engaged in sexually explicit conduct, it is not clear why the government sought to have law
enforcement agents search the entirety of Mr. Meek's files.  The government has the technical
capability to search only for video and image files, for example, in a manner similar to conducting
keyword searches.

[21]　　For example, taking an obvious scenario, it would be unreasonable for the government to
justify, and for senior DOJ officials to approve, a search procedure that was driven by the
government's interest in obtaining access to Mr. Meek's newsgathering materials.

hearing where the facts relating to the government's review of newsgathering material can be developed.

### IV.   Documents and information relating to the government's investigation of press leaks.

As noted above, an individual or individuals with detailed information regarding Mr. Meek's case leaked the information to members of the media, and others.  Such leaks are prohibited by Fed. R. Crim. Proc. 6(e), which provides that government attorneys and their agents have a duty to maintain grand jury secrecy. *See also* Justice Manual 1-7.400(A)-(C) (providing that communications between DOJ personnel and members of the media must be approved in advance, that DOJ personnel are prohibited from commenting on pending investigations, including the existence of an investigation).

If the government has information regarding the identity of the individual(s) who leaked confidential information regarding the investigation of Mr. Meek, the government should be ordered to disclose this information.   Because unauthorized dissemination of a confidential government investigation plainly reflects bias against the target of that investigation, such information is within the scope of *Brady/Giglio* if the individual(s) were involved in the investigation, or otherwise had decision-making authority with respect to the investigation of Mr. Meek.  *See, e.g.*, *United States v. Bagley*, 473 U.S. 667, 676–77 (1985) (recognizing that evidence of bias falls within the scope of *Brady*); *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (ordering prosecutor must search internal police files for possible impeachment information about officers important to the case); *Nuckols v. Gibson*, 233 F.3d 1261 (10th Cir. 2000) (*Brady* violation when prosecutor withheld investigation into investigation of misconduct by investigating officer because his credibility was key to suppression hearing on *Miranda*).  In line with this authority, the Justice Manual requires

the government "to seek all exculpatory and impeachment information from … federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant." United States Attorneys' Manual § 9–5.100(B)(2).[22]   Illegal press leaks by members of the DOJ or FBI call into question the good faith and integrity of the government's investigation and prosecution. *See, e.g.*, *United States v. Quinn*, 537 F. Supp. 2d 99, 115 (D.D.C. 2008) (recognizing the importance of "attacking the integrity of the government's investigation"); *Lindsey v. King,* 769 F.2d 1034, 1042 (5th Cir.1985) (awarding a new trial because withheld *Brady* evidence "carried within it the potential … for the … discrediting … of the police methods employed in assembling the case"); *United States v. Borges*, 153 F. Supp. 3d 216, 218 (D.D.C. 2015) (dismissing case where the government disclosed that officer involved in evidence seizures was caught with stolen evidence, thereby undermining the integrity of the government's case).   Information bearing on these matters is therefore *Brady* material, and must be disclosed to the defense.[23]

---

[22]      *See also* Justice Manual § 9-5.100(5)(c) ("[P]otential impeachment information relating to agency employees *may include, but is not limited to* ... i) any finding of misconduct that reflects upon the truthfulness or possible bias of the employee, including a finding of lack of candor during a criminal, civil, or administrative inquiry or proceeding; ii) any past or pending criminal charge brought against the employee; iii) any allegation of misconduct bearing upon truthfulness, bias, or integrity that is the subject of a pending investigation; iv) prior findings by a judge that an agency employee has testified untruthfully, made a knowing false statement in writing, engaged in an unlawful search or seizure, illegally obtained a confession, or engaged in other misconduct; v) any misconduct finding or pending misconduct allegation that either casts a substantial doubt upon the accuracy of any evidence-including witness testimony-that the prosecutor intends to rely on to prove an element of any crime charged, or that might have a significant bearing on the admissibility of prosecution evidence.") (emphasis added).

[23]      On the other hand, if the government failed to take steps to investigate who among its ranks leaked information about the investigation of Mr. Meek, this fact should be disclosed to Mr. Meek as well.  A failure to investigate a matter such as this reflects a bias on the part of the agency that is prosecuting Mr. Meek.

## CONCLUSION

For all of the foregoing reasons, the Court should order the government to disclose (1) the facts and circumstances that led to Dropbox's discovery of the files at issue, including any law enforcement involvement in the search for these files, and the details of Dropbox's examination of those materials; (2) all documentations from the VSP, ACPD, and any other agency that participated in the investigation of Mr. Meek; (3) the filter protocol memoranda governing the search of Mr. Meek's electronic devices, and (4) documents and information relating to the government investigation into the unauthorized press leaks relating to the investigation of Mr. Meek.

Respectfully Submitted,

By: /s/ *Eugene V. Gorokhov*
Eugene Gorokhov, Bar No. 73582
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1750 K Street NW, Suite 300
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document VIA ECF which provides a copy to the

AUSA of record.

By: /s/ *Eugene V. Gorokhov*
Eugene Gorokhov, Bar. No. 73582
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1750 K Street NW, Suite 300
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com