

## Case Information

21-SF-006855-A | The People of the State of California vs. Alexander Levy

Case Number
21-SF-006855-A
File Date
06/07/2021

Court
Criminal
Case Type
Complaint

Case Status
Active

THE COURT:  This is the matter of People vs. Alexander Levy.

Your appearances, please.

MS. DAVIS:  Good morning, Your Honor. Dominique Davis for the People.

MR. BARTON:  And Ban Barton and Camden Vilkin present on behalf of Mr. Levy.  He's present out of custody.

THE COURT:  Good morning, Counsel.

MS. VILKIN:  Good morning, Your Honor.

THE COURT:  All right.  And we ready to go?

MS. DAVIS:  Yes, Your Honor.  The People do need to file an amended Complaint prior to the start of the preliminary hearing.

THE COURT:  I seem to be in possession of that. Has that been provided to counsel?

MS. DAVIS:  It has, Your Honor.

THE COURT:  And waive formal reading and advisement of rights as to the amendments?

MR. BARTON:  So waived.

THE COURT:  I assume you'll renew the same pleas.

MR. BARTON:  There -- a plea of not guilty is entered.  I believe the amended Complaint conforms to a case that came out after the filing of the original complaint in this document so we have in objection.

**ROUGH DRAFT**

THE COURT:  All right.  There being no objection, it will be filed.

Any motions before we begin?

MS. DAVIS:  Yes, Your Honor.  The People do ask to designate Deputy Currie as our investigating officer.

THE COURT:  He'll be so recognized.

THE CLERK:  Can I get a spelling, please?

THE WITNESS:  C-u-r-r-i-e.

THE COURT:  Thank you, Sergeant.

MR. BARTON:  I make a motion to exclude witnesses.  There's probably only two witnesses, so it may be a mere formality.  But I will make that motion anyways.

THE COURT:  We'll recognize the formality for what it's worth.

MS. DAVIS:  There are, Your Honor, three witnesses.  For the Court and counsel's information, one, who will be the third witness I call, is printing images right now.  I imagine he will come in mid-testimony of Sergeant Currie.  I will stop, get the images, and have him wait outside.

THE COURT:  That's fine.

MS. DAVIS:  Thank you.

THE CLERK:  Counsel, do we need to address Counts 2 and 3?

MS. DAVIS:  So we just filed the amended, but

**ROUGH DRAFT**

3

do you want me to put it on the record?

So the exact amendment that was made, Your Honor, is Counts 2 and 3, which are violations of Penal Code Section 311.11(c)(1) and (c)(2), used to be their own substantive charges.  A case has come down since the filing of the original Complaint that says that those are actually special allegations.  They cannot be their own stand-alone charges.  And so that is what the amendment is.

THE COURT:  That's fine.  You both had referred to a case.  Do you want to enlighten me?

MS. DAVIS:  I will, Your Honor.  I'm looking it up right now.  Sorry.

THE COURT:  I must be behind on my --

MR. BARTON:  Oh, the --

MS. DAVIS:  I have it.  It's *De La Cerda*, D-e L-a C-e-r-d-a, *vs. Superior Court*, 75 Cal.App.5th 40.

THE COURT:  Got it.  Thank you.

MR. BARTON:  I have a hard copy if the Court wants to review it.

THE COURT:  I don't think it's going to affect me one way or the other.

MR. BARTON:  I agree.

THE COURT:  So let's get started.

MS. DAVIS:  Thank you, Your Honor.  At this time --

**ROUGH DRAFT**

MR. BARTON:  And there is has been a motion to
suppress filed to be heard contemporaneous with the
preliminary examination.

THE COURT:  Thank you for bringing that to my
attention.  Let me find the -- that was filed back in
January?

MR. BARTON:  Yes.

THE COURT:  And that's pending as of today?

MR. BARTON:  Yes.  And it was filed with the --
in anticipation of it being heard contemporaneous with
the prelim.

THE COURT:  Give me a minute to take a look at
that.  Okay?  So I know -- both counsel could just
enlighten me as to what the 1538 issue is so that I'm
aware of it as the facts come in.

MR. BARTON:  Certainly.

In this case, there was a report from Dropbox
to the National Center for Missing and Exploited
Children, which we refer to as NCMEC.  And NCMEC then
provided a CyberTip that went to a police officer,
Officer Currie.  And after receiving that CyberTip, he
opened and watched the videos that were referenced in the
CyberTip.

There's conflicting authority on the legality
of that.  Where there's a government search that merely
replicates what a private party has already searched and

**ROUGH DRAFT**

5

doesn't go beyond the scope of the private party search, then that's authorized.  If the -- there has been --

THE COURT:  I take it the theory is that someone has sort of published it, if you will, and it's in the public domain?

MR. BARTON:  Right.  Exactly.

THE COURT:  A plain view, if you will.

MR. BARTON:  Right.  That the individual has already lost their expectation of privacy because a private party without government involvement has exposed whatever it was.

The -- one of the main cases on this involves an interception by a private party of, I think, a pornographic film.  And they look at the wrapping for the film, and they say, We should give this to the feds.  And the feds look at it, and they play the film.  And they say that the intrusion of playing the film was more an intrusion than looking at the wrapping and that that violated the person's expectation of privacy and was an illegal search.

In this context, there are two cases that are both about the same case, *People vs. Wilson*.  The California Court of Appeal opinion finds that it's a lawful search.  And a federal Ninth Circuit opinion based on the same facts for the same individual has found that it's an unlawful search.

**ROUGH DRAFT**

THE COURT:  And I take it both those cases are final?

MR. BARTON:  Yes.

THE COURT:  Got it.

MS. DAVIS:  And, Your Honor, in both of those cases, it's the same defendant.  He was charged in the state and federally.  He filed 1538s in both.  They were both denied.  He appealed both.  So it is the same set of facts.

The People's main arguments for the Court is the state case, which says a warrant is not needed, is binding on this Court.  The federal case, which says something different, is not and, in the People's position, should be disregarded.  And lastly, there's a major fact difference between this case and the case -- *Wilson* case in that the *Wilson* case involved Google identifying child sexual abuse material via hashtag technology, so an algorithm --

MR. BARTON:  Your Honor, I ask the witness be removed during this argument because we're having the discussion regarding the significance of the testimony.

THE COURT:  Before we go any further -- you guys are arguing stuff.  I haven't read any of the pleadings.  I don't have any of the facts in front of me. I get the gist of this.  Let's get to work.

And I would suggest the first step that we take

is I would like you to address with your client

the one-session rule because I have a feeling I'm going

to have some reading to do when all the evidence is in,

and I'm not going to shoot from the hip on a decision

like this when I've got conflicting cases.  Okay?

        MR. BARTON:  Yeah.  May I voir dire my client?

        THE COURT:  Please.

        MR. BARTON:  Mr. Levy, do you waive your right

to a continuous preliminary examination in this case to

allow the Court to take breaks or consider other business

or do research and then reconvene at a later date to

continue to hear your matter?

        THE DEFENDANT:  Yes.

        THE COURT:  All right.  Thank you.  I'll accept

that as a knowing, intelligent waiver of Mr. Levy's right

to a one-session preliminary examination.

        And you join in that waiver, Mr. Barton?

        MR. BARTON:  I do.

        THE COURT:  Very well.  And I agree we

shouldn't be arguing law in front of witnesses.

        MS. DAVIS:  I was responding to defense's

argument.

        THE COURT:  I understand.  But let's -- we'll

save it for when all the evidence is already in.

        MS. DAVIS:  Okay.  Thank you.

        At this time, Your Honor, the People call

**ROUGH DRAFT**

Tobias Wulff to the stand.

THE COURT:  Come on up here.  Please stand next to this beige chair, face the clerk, and raise your right hand.

THE CLERK:  Do you solemnly state under penalty of perjury that the evidence you shall give in this matter shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE CLERK:  Thank you.  Please be seated.

And for the record, can you state and spell your first and last name, please?

THE WITNESS:  Yes.  My name is Tobias Wulff. First name Tobias, T-o-b-i-a-s.  Last name Wulff, W-u-l-f-f.

THE COURT:  Mr. Wulff, first of all, I'm not sure that that microphone is on.

Thank you.

Have you testified before?

THE WITNESS:  I have not.

THE COURT:  Okay.  So a few quick rules of the road.  Please make yourself comfortable.  Move the mic any way you want to so you sit comfortably and speak into the microphone.

Please wait until the attorneys' question is complete before you begin your answer, even if you know

**ROUGH DRAFT**

9

what the answer is before they stop.  If two people are speaking at the same time, it makes it very difficult for the reporter to accurately record the proceedings.

If an objection is lodged by the opposing party of the questioner, please do not answer until I have a chance to rule on the objection.  "Sustained" means you're not to answer.  "Overruled," you may answer.

You with me?

THE WITNESS:  With you.

THE COURT:  Any questions?

THE WITNESS:  Not so far.

THE COURT:  Let's go.

MS. DAVIS:  Thank you.

**TOBIAS WULFF**,

called as a witness on behalf of the People, having been first duly and regularly sworn, testified as follows:

**DIRECT EXAMINATION**

Q.  BY MS. DAVIS:  Mr. Wulff, how are you employed?

A.  I'm employed by Dropbox, and I'm the content safety manager.

MR. BARTON:  Excuse me.  The what manager?

THE WITNESS:  Content safety manager.

MR. BARTON:  Thank you.

Q.  BY MS. DAVIS:  As a content safety manager, what are your duties?

**ROUGH DRAFT**

A.  My duties are to run a team that reviews and enforces Dropbox's AUP or acceptable use policy.

Q.  Are you familiar with the term "CyberTip"?

A.  I am.

Q.  And will you please briefly describe for us what a CyberTip is?

A.  A CyberTip is the result of a review specific to child sexually explicit material that is provided to NCMEC, the National Center of Exploited and Missing Children [sic].

THE COURT:  I'm going to ask you to try and keep your voice up.  I often tell witnesses use your outside voice.

THE WITNESS:  You got it.

THE COURT:  All right.  Thank you.

Q.  BY MS. DAVIS:  Now, is there a procedure that Dropbox, Incorporated employs in order to enforce this AUP, as you call it?

MR. BARTON:  Objection.  Vague as to time.

THE COURT:  Do you understand the question?

THE WITNESS:  I was going to ask for a clarification.

THE COURT:  Why don't you restate it?

Q.  BY MS. DAVIS:  Okay.  Is there -- when CSAM is located in a Dropbox user's account, is there a certain procedure an employee must follow upon locating it?

ROUGH DRAFT

11

MR. BARTON:  Objection.  Vague as to time.

THE COURT:  You know, sustained.  I'm not sure exactly -- give me a second so I can open a file.

Now you want to restate the question for me? Because I'm -- I was distracted.  Please go ahead.

Q.  BY MS. DAVIS:  Okay.  My understanding -- and maybe I misheard -- is that part of your team's job is to identify child sexual abuse material.  And just so that we don't have to keep saying that, it's CSAM, C-S-A-M. Is that correct?

A.  Yes.

Q.  Okay.  So what I'm asking is what is the company's policy and procedure for your team when that CSAM has been identified?

MR. BARTON:  And I will renew my objection of vague as to time.

THE COURT:  Yeah.  What was it at the time of this offense is what your objection is.

Did you understand the question in that fashion?

THE WITNESS:  I understand the question.

THE COURT:  You may answer it with that amendment.

THE WITNESS:  The answer is yes.  At the time, we have a process to review CSAM.

THE COURT:  What was the process?

**ROUGH DRAFT**

12

THE WITNESS:  The process is to review whatever peace of content that a reviewer comes across.  And we follow pretty strict policy and protocols that involve things like the Tanner scale to identify age as well as the actual acts within the piece of content.

Q.  BY MS. DAVIS:  Okay.  Now, when you say "review," does that mean that a Dropbox employee actually visually sees the CSAM content?

A.  That is correct.

Q.  And is part of the policy and procedure of Dropbox to then create a -- or generate a CyberTip to be forwarded to NCMEC?

A.  That is in compliance with the law.  We are obligated by law to do so.

Q.  Okay.  And in that CyberTip, does Dropbox include information about whether or not the employee had seen the image?

MR. BARTON:  Objection.  This appears to be calling not -- if this is just about policy and practice, I don't have an objection.  If this is about what happened on this occasion, I do have an objection.

THE COURT:  No, I understand.  I understood the question still to be in the general policy realm.

Is that correct, ma'am?

MS. DAVIS:  Yes, Your Honor.

THE COURT:  Overruled.

**ROUGH DRAFT**

13

THE WITNESS:  Yes.

Q.  BY MS. DAVIS:  Okay.  And is the employee required to include a classification, as you called it, of what kind of CSAM material they believe they've seen?

A.  Yes.

Q.  And can you for us briefly describe what that classification is or how it works?

A.  The classifications range from a taxonomy of A1, A2, B1, and B2.  And that is dependent on the age of the subject in the content.  And the number is correlated to the specific act within that piece of content.

Q.  I would like to show you what has been previously marked as People's Exhibit 1.  It has been provided to defense counsel in discovery.  It is a six-page document.  I'd ask you to look at these six pages and tell me if you recognize what this is.

MR. BARTON:  Is that the CyberTip report?

MS. DAVIS:  Yes.

THE WITNESS:  Yes.  That's exactly -- it looks like a CyberTip report.

(People's Exhibit 1, having been premarked, identified for the record.)

Q.  BY MS. DAVIS:  Okay.  Now, when you look at that document, does it comply with the policies and procedures of Dropbox, of the requirements?

MR. BARTON:  Objection to the form of the

**ROUGH DRAFT**

14.

question.  This is a document generated by NCMEC.  And I
don't believe that a document generated by NCMEC can
either conform or not conform with the Dropbox policy.

THE COURT:  NCMEC is a separate entity from
Dropbox?  That's your point?

MR. BARTON:  Right.  NCMEC is -- it's a
quasi-private interrelated-to-the-government organization
called the National Center for Missing and Exploited
Children.  And this is a document produced by NCMEC in
response to the tip from Dropbox.

THE COURT:  Got it.

MS. DAVIS:  If I may, Your Honor?

THE COURT:  Go ahead.

MS. DAVIS:  This witness is testifying, based
on his experience and his role, to information that
Dropbox employees are required to put inside of a
CyberTip.  This is a CyberTip, as he has now recognized
it.  I think he can testify whether or not the
information included matches the policies of their
company.

THE COURT:  So if I understand correctly,
People's 1 contains information provided to NCMEC by a
Dropbox employee; correct?

MS. DAVIS:  That's correct, Your Honor.

THE COURT:  Overruled.

You can answer.

**ROUGH DRAFT**

THE WITNESS:  Can you please repeat?

Q.  BY MS. DAVIS:  Yes.

Based on your review of that CyberTip, does the information contained therein comply with the requirements of Dropbox employees upon locating CSAM?

A.  Yes.

Q.  And just for the record, on the first page, is that CyberTip Report Number 73001154?

A.  Yes.

Q.  Okay.  Now, you previously testified that you have -- or Dropbox has a legal obligation to report CSAM when it's found.  When those reports are being made, are they at the behest or request of law enforcement?

MR. BARTON:  Objection.  Calls for an opinion. Kind of calls for a legal conclusion.

THE COURT:  Yeah.  As I understand it, it's a -- when you say "a legal obligation," that's a statutory obligation.  That's what you mean; correct?

MS. DAVIS:  Yes.  I guess, technically.

THE COURT:  Yeah.  And it does call for a legal conclusion.  Sustained.

Q.  BY MS. DAVIS:  Okay.  I'm going to go back to your job.  How long have you been in this position?

A.  I joined Dropbox in April of this year.

Q.  And what training and experience did you have to receive to become a manager of your team?

**ROUGH DRAFT**

16

A.   Ample training revolved around many documents, training workflows through presentations, again, that go into the depths of exactly defining what is and isn't CSAM.

        MR. BARTON:  May I make a motion to strike the totality of his testimony regarding policies that were in place in 2020 before he joined Dropbox as hearsay? Because I think there needs to be some foundation.

        THE COURT:  Do you wish to be heard?

        MS. DAVIS:  I'm getting to the foundation as I'm speaking with this witness, Your Honor.

        THE COURT:  Okay.  Subject to a motion to strike.  If she can lay a proper foundation, we'll deal with it then.

        Go ahead.

    Q.   BY MS. DAVIS:  And did part of that training to be in your position go over what your obligations are as a member of Dropbox if you locate CSAM material?

    A.   Yes.

    Q.   And what are those obligations that you were trained in?

        MR. BARTON:  Objection.  Relevance and hearsay and -- and irrelevant as to time.

        THE COURT:  I understand that was the relevance objection.  That's -- I'll take that under submission for a future motion to strike if she can't lay the foundation

**ROUGH DRAFT**

as to the duration of those procedures.

        With regard to hearsay, I understand it to be being offered what he understands his obligations are and therefore his state of mind.  It will come in for that purpose.

        MR. BARTON:  Thank you.

        THE COURT:  Go ahead.

    Q.  BY MS. DAVIS:  Are you aware of what the policies regarding locating CSAM materials are or were in May of 2020?

    A.  I have a rough understanding, yes.

    Q.  And what is that rough understanding based on?

        MR. BARTON:  Is my objection a continuing objection?

        THE COURT:  It's so understood.  Let's get through the foundation, and then you can argue it as to whether it's made or not.

        Go ahead.

        THE WITNESS:  One more time, please?

    Q.  BY MS. DAVIS:  Sorry.

        What is your rough understanding of the policies in 2020 based on?

    A.  My understanding is based on most of the same training material and policies that are in place today.

    Q.  And I guess I'll say, how do you know that the training policies were the same when you came into the

company as they were in May of 2020?

    A.  Through historical documentation.

    Q.  Okay.  And were those documents you received from the company?

    A.  Yes.

    Q.  Okay.  Are you aware -- it's okay if you're not, but are you aware when this obligation to report CSAM material to NCMEC came about?

    A.  I'm not fully aware.

    Q.  In your role as a manager, have you ever been informed that policies had recently changed?

    A.  No.

    Q.  Do you work with anyone who worked there in May of 2020?

    A.  I'm not fully sure.

    Q.  Okay.  And regarding the obligation to report, where did you learn of that?

    A.  I learned of obligations, again, through training and reviewing our kind of workflow and policies. Part of that is explicitly calling out what our obligations are in relation to reviewing CSAM material.

    Q.  And in your training, do they inform you whether or not this is a legal requirement of the company?

        MR. BARTON:  Objection.  Leading.

        THE COURT:  Overruled.

ROUGH DRAFT

THE WITNESS: Yes.

Q. BY MS. DAVIS: And is it a legal requirement of the company?

A. Yes.

MS. DAVIS: Okay. I don't believe I have anything further for this witness, Your Honor. I believe the foundation has been laid. If --

THE COURT: Mr. Barton?

MR. BARTON: So I'm not -- is this just the foundation for his continuing to testify regarding policies, or are you resting with this witness?

MS. DAVIS: I'm resting with the witness, but I need to know if the motion to strike --

THE COURT: Well, that's why I'm inviting him to argue it.

MR. BARTON: So Mr. Wulff was not employed in 2020. He doesn't know if any of the people who are reviewers were doing it in 2020. He has no firsthand knowledge about how the system worked in 2020. He shouldn't be able to testify as to how things worked in 2020. It's all hearsay.

THE COURT: I have a little problem with the hearsay aspect. It seems as though he can't even testify from personal knowledge that the policy -- he did testify that he believes the policies in place today were the same at that time, but that's hearsay. He's not at

**ROUGH DRAFT**

Dropbox two years earlier than his hire.

MS. DAVIS:  But, Your Honor, he got the information from training and materials.  He's not saying someone told him that.  This is from materials that he received, so it's not hearsay.  It's his training.  It's his experience and what he had to learn in order to be in the position that he is in.  So I do not believe it's based on -- or only based on hearsay.  It's not as though someone just told him something is the same.  He has reviewed documentation.  That is how he's getting this information.

THE COURT:  Go ahead.

MR. BARTON:  I think that that's classic hearsay.  You review documentation.  You believe the document.  That's just as if somebody had told him.

THE COURT:  In other words -- excuse me.  I'm sorry for speaking over you, Mr. Barton.

The documentation itself, not having been authenticated in court, is an out-of-court statement offered for the truth of the matter stated in the documentation.  It is hearsay.

MS. DAVIS:  I don't really believe it's offered for the truth of the matter asserted, Your Honor.

THE COURT:  Well, no.  His statement that the policy in 2020 based on something he read is being offered for the truth of the matter of what he read.

It's -- in terms of his state of mind, he believes it to be so.  But he can only believe it to be so if the statements in the documentation are, in fact, true.

MS. DAVIS:  Well, in that case, Your Honor, the People would seek to identify this witness as an expert in Dropbox Incorporation's policy and procedure and reporting CSAM material.

THE COURT:  Mr. Barton, do you wish to be heard on that?

MR. BARTON:  I don't believe he will qualify as to the procedures in place at Dropbox in 2020 at the relevant time.  And in laying a foundation, I think we've exposed his lack of expertise regarding the practices of the individuals employed at Dropbox during the relevant time period.

THE COURT:  Let's talk about whether he qualifies as an expert witness in the current policies of Dropbox because I would suggest that that is something -- what the policies are of Dropbox is something outside the kin of the trier of the fact.  I don't know what the policies are; right?  He can testify as to what they are today if he has expertise in that area because he manages that section.  He has particular expertise in the area. And he can rely on hearsay to say what the procedures are certainly today.  And then he could, I suppose, opine as to what they were two years prior to his hire.  I take

that to be the thrust of Ms. Davis's proffer.

  MS. DAVIS:  That's correct, Your Honor.

  MR. BARTON:  And I agree that he would likely qualify as an expert as to the present procedures and suggest that the timing issue renders the relevant testimony outside the scope of his expertise.

  THE COURT:  In terms of what I know about -- I take it these were written procedures that you reviewed as part of your training; correct?

  THE WITNESS:  Yes.

  THE COURT:  All right.  From what I know so far, I think his objection is well taken as to the connection of the timing.  Why don't you explore that a little bit with him as to how he knows the -- when those publications were generated, et cetera, if he does?

  MS. DAVIS:  Okay.

  THE COURT:  Go ahead.

  Q.  BY MS. DAVIS:  Do you have any idea how long Dropbox has been using the training materials that you received in the course of your duties?

  MR. BARTON:  Objection to the form of the question.  It calls for hearsay.  "Do you have any idea?"

  THE COURT:  Yeah.  Yeah.  Sustained as phrased.

  Q.  BY MS. DAVIS:  Do you know what written materials Dropbox required you to become familiar with in order to receive your position?  Do you know how long

Dropbox has used those materials?

        MR. BARTON:  Objection.  Compound.

        THE COURT:  Do you understand the question?

        THE WITNESS:  I believe I do.

        THE COURT:  You may answer.

        THE WITNESS:  Yes.  Those materials have been at Dropbox long before I joined.  And if I could add, classifying CSAM has remained the same as long as I can remember.

    Q.  BY MS. DAVIS:  Can you try -- or specifically -- when you're saying for a long time and for as long as you can remember, is that before May of 2020?

    A.  Yes.

        MR. BARTON:  Objection.  Vague as to what we're asking is before 2020.

        THE COURT:  Sustained.

    Q.  BY MS. DAVIS:  Okay.  You talked about two things.  So the materials themselves, when you say that they have been used by Dropbox for a long time, I think is the words you used, does that mean prior to May of 2020?

    A.  It does.

        MR. BARTON:  Objection.  Outside the scope of personnel knowledge.

        THE COURT:  Sustained as phrased.

**ROUGH DRAFT**

May I?

MS. DAVIS:  Yes.

THE COURT:  The materials we're talking about,
are they in hard copy, or are they online or both?

THE WITNESS:  Online.  Or they're -- yeah.

THE COURT:  All right.  So it's a document in a
file in Dropbox's network?

THE WITNESS:  Correct.  Internal document.

THE COURT:  Got it.  And then is there anything
on those internal documents that displays their last
edited date?

THE WITNESS:  It depends on the documents, but
yes.

THE COURT:  Right.  And the documents we're
talking about are the training materials related to CSAM
treatment and reporting?

THE WITNESS:  That's correct.

THE COURT:  And those have some sort of
designated last edited date?

THE WITNESS:  Yes.

THE COURT:  Are you familiar with what the last
edited date is on the materials we've been talking about?

THE WITNESS:  I can't say for sure.

THE COURT:  All right.  Next question.

Q.  BY MS. DAVIS:  And would it refresh your
recollection if you were the able to look at those

**ROUGH DRAFT**

documents?

    A.   Yes.

       MS. DAVIS:  If I could have a moment, Your Honor?

       THE COURT:  Sure.  Of course.

    Q.  BY MS. DAVIS:  And are those located online for anyone to see, or would you have to be at the Dropbox location?

    A.  You would have to be a Dropbox employee.

       THE COURT:  So you could be off-site working from home on a VPN, and you can access the document?

       THE WITNESS:  That's correct.

       THE COURT:  Go ahead.

    Q.  BY MS. DAVIS:  So I guess I'm wondering then why you believe that the current policies regarding CSAM reporting have been in place for a long time.

    A.  Because when I on-boarded and joined Dropbox, part of my training was ample amount of reading and those documents that cover both historical and current policies.

       MS. DAVIS:  So I would make the same motion, Your Honor, to designate this witness as an expert in the policies and procedures of Dropbox as it applies to CSAM reporting.

       THE COURT:  Do you wish to be heard?

       MR. BARTON:  Yes.

**ROUGH DRAFT**

THE COURT:  Go ahead.

### VOIR DIRE EXAMINATION

Q.  BY MR. BARTON:  Regarding the procedures that were actually followed, have you spoken with people who did the reviewing work in 2020?

A.  It's tough to say for sure.

Q.  Do you know who was employed as a reviewer for Dropbox in May of 2020?

A.  Our team is employed by contractors that are -- have time limits on their allowed employment, so I can't distinguish who and who wasn't there.  The team is relatively large, and because of that time limit, I can't say for sure.

Q.  Are the people who do the reviewers employees of Dropbox?

A.  I'm not a legal employment lawyer, so I don't feel comfortable answering that.

Q.  Fair enough.

Is there a policy at Dropbox to maintain a link between who the reviewer is and the tip that results from their review?

A.  Yes.

Q.  So as to this review, the CyberTip that's been marked as Exhibit Number 1, does Dropbox know who conducted the actual review?

MS. DAVIS:  Objection.  Beyond the scope of his

expertise.

        THE COURT:  Overruled.  No.  It's questioning his expertise.  Overruled.

        Do you understand the question?

        THE WITNESS:  I do.

        THE COURT:  You may answer.

        THE WITNESS:  Can you repeat, please?

    Q.  BY MR. BARTON:  Does Dropbox know who the individual is that conducted the review that resulted in the CyberTip that's been identified as Exhibit Number 1?

    A.  Yes, depending on data retention.

    Q.  And are there records at Dropbox that maintain a link between the individual reviewer and the material that they identified as CSAM?

    A.  Again, yes, depending on data retention policies.

    Q.  In your role as content safety manager, do you do any type of quality control to see whether the reviewers are actually following the policies of Dropbox?

    A.  Yes.

    Q.  And are you aware of the level of review that was in effect for reviewers in May of 2020?

    A.  I'm not understanding the question.

    Q.  Well, do you know whether there was any type of review or quality control that was given to the reviewers who were looking for CSAM in May of 2020?

**ROUGH DRAFT**

28.

A.   Yes.

Q.   And what was the level of quality control for reviewers looking for CSAM in May of 2020?

MS. DAVIS:   Objection.   Vague.

THE COURT:   Do you understand the question?

THE WITNESS:   Can you repeat?

Q.   BY MR. BARTON:   Sure.   Let me ask a better question.

Can you describe the quality control procedures that Dropbox employed for the reviewers who were looking for CSAM in May of 2020?

A.   Not confidently.

Q.   Have you done anything to learn about the quality control procedures that Dropbox had in place to review the work of reviewers in May of 2020?

A.   It's tough to say.

Q.   Does Dropbox keep records regarding quality control of -- and performance of individuals employed to be reviewers for CSAM material?

A.   I didn't understand.

Q.   Thanks.   When you don't understand, please make it clear.   And that's means I'm not doing my job well, and I'll ask a better question.

Does Dropbox maintain records as a type of performance review or accuracy of people who were performing reviews for CSAM in May of 2020?

**ROUGH DRAFT**

29

A.   The data retention policies are out of my scope.  I can't say.

THE COURT:  Can I?

Just to clarify, when you refer to something called "data retention policies," can you explain that a little bit, what you mean by that?

THE WITNESS:  Sure.  So Dropbox, like any other company, has loads of data.  And some of -- retention is how long you keep it for, right, in keeping records.  How long is out of scope.  They follow typical data retention laws that I'm not keen on.

THE COURT:  All right.  And so when you had said about linking the reviewer to a particular CyberTip, there is such a record subject to the duration of retention that is the policy of Dropbox; correct?

THE WITNESS:  That's right.

THE COURT:  If I may?  One more.

MR. BARTON:  Certainly.

THE COURT:  Are you aware of what the time period is for data retention for such a record?

THE WITNESS:  I'm not.

THE COURT:  All right.  Go ahead, Counsel. Pardon the intrusion.

Q.  BY MR. BARTON:  Do you know who performed the review of the CSAM material at issue in the CyberTip 73001154, which is now identified as Exhibit 1?

**ROUGH DRAFT**

MS. DAVIS:  Also, objection.  Doesn't go to his expertise.

THE COURT:  To the contrary.  I think it does.

Go ahead.  You may answer.

THE WITNESS:  By name, no.

Q.  BY MR. BARTON:  By some other identifier?

A.  Not off the top of my head.

Q.  Is that information that you had at one point but you no longer remember?

A.  I can't confidently answer that.

Q.  Has anybody told you not to report the identity of the individual who conducted the review for CyberTip that's been identified as Exhibit Number 1?

A.  One more time, please?

Q.  Has anybody told you not to remember or not to reveal the identity of the reviewer of the CyberTip that's been marked as Exhibit Number 1?

MS. DAVIS:  Objection.  Doesn't go to his expertise.

THE COURT:  Yeah.  I agree with that.  And I don't think he's -- I think he's testifying he can't conjure that name sitting here today.  But from my point of view as the trier of fact, what's important is whether he's capable of retrieving that name based on their data retention policy, if that makes sense, Counsel.

MR. BARTON:  It does.

**ROUGH DRAFT**

THE COURT:  Please go ahead.

Q.  BY MR. BARTON:  As content safety manager, are you the individual responsible for enforcing Dropbox policy as to how reviewers do their work?

A.  Yes.

Q.  As to present Dropbox procedures and policies, do you keep records as to performance issues and quality control issues of reviewers looking for CSAM material?

A.  Yes.  We have quality measures in place.

Q.  Have you looked at those quality measures for how the reviewers perform their duties in May of 2020?

A.  Please repeat.

Q.  So I know you weren't working in May 2020.  In your role as content safety manager, have you looked back to May of 2020 to look at those metrics of job performance quality control for reviewers in May 2020?

A.  Not explicitly.

MR. BARTON:  I'd object to this witness being permitted to testify as to policies or procedures for 2020 but certainly not procedures.  If he testifies that the policies were in effect or the policies weren't edited substantially and were very similar to what was in place in May 2020, he may be able to do that with a sufficient foundation.  I don't think that's been laid. But I don't think he's going to be able to testify about the procedures that were actually in place, about how

**ROUGH DRAFT**

32.

people did their work in 2020 or specifically for this
CyberTip.

            THE COURT:  Ms. Davis?

            MS. DAVIS:  Thank you, Your Honor.

            As the Court is aware, all that is required for
an expert is that he have special knowledge, skill,
training, or education sufficient to qualify him as an
expert on a particular subject to which his testimony
relates.  This witness has said that he's reviewed
current and historical data regarding Dropbox's policies
and procedures when it comes to reporting CSAM material.
That means that he has training and experience above that
of -- whether it be you, Your Honor, or a jury, above
that of the trier of fact, and he can explain those
policies and procedures to the trier of fact based on his
training and experience.  He then can opine as to what
the policies and procedures were in 2020, and the Court
then can weigh whether -- or give it as much weight as
the Court would like.  But there is nothing about what
this witness had testified to that suggests his testimony
should be stricken and that he is not qualified to be an
expert in this very small area.

            THE COURT:  Indeed arcane.

            Is the matter submitted?

            MS. DAVIS:  Yes, Your Honor.

            MR. BARTON:  Yes, Your Honor.

**ROUGH DRAFT**

THE COURT:  All right.  Thank you.

I'm going to allow him to testify as an expert. I agree it goes to the weight of his opinion given that he's relying on internal documents that he's familiar with.  And by all accounts, those documents set forth a procedure that he believes was in effect in May of 2020.

MS. DAVIS:  Thank you, Your Honor.

THE COURT:  Go ahead.

### DIRECT EXAMINATION CONTINUED

Q.  BY MS. DAVIS:  And so if I can ask just for clarity.  In May of 2020, were reviewers of Dropbox users' accounts required to visually look at the content of the user account, classify it, and -- and classify it prior to reporting it to NCMEC?

A.  Yes.

MR. BARTON:  May I have a standing objection on the vague as to time issue?

THE COURT:  No.  She said May of 2020.

MR. BARTON:  Great.  Thank you.

MS. DAVIS:  Thank you, Your Honor.

THE COURT:  Overruled.

Q.  BY MS. DAVIS:  And lastly, just to clarify something that just came up on cross, you testified that you don't know if each reviewer legally is an employee of Dropbox.  But are reviewers required to follow the policies and procedures of Dropbox?

**ROUGH DRAFT**

A.   Yes.

MS. DAVIS:   I have nothing further, Your Honor.

THE COURT:   All right.   And further cross.

### CROSS-EXAMINATION

Q.   BY MR. BARTON:   You indicated that you don't know the identity, either name or some other identifier, for the person who did the actual review.   Is that record about who the reviewer was contained in any Dropbox record?

A.   That's dependent on data retention.

Q.   If I were to request that record, how would I describe the record that reveals the identity of the reviewer?

MS. DAVIS:   Objection.   Relevance.

THE COURT:   No.   Overruled.

THE WITNESS:   How would you -- I'm not sure how you would request that.

Q.   BY MR. BARTON:   Is that a document that you have access to when you're logged on to the Dropbox network?

MS. DAVIS:   Objection.   Vague as to "document" and beyond the scope.   He wouldn't know what a lawyer needs to do to request something from --

THE COURT:   No.   That's not what he's asking, what a lawyer has to do.   He's asking does he have access to the Dropbox document that identifies the link between

**ROUGH DRAFT**

the reviewer and the CyberTip at issue in People's 1.

Did you understand the question that way?

THE WITNESS:  I understood it the former.  How I understood it -- how he would, not how I would.

THE COURT:  That's not what he's asking now. This question is do you have access -- correct me if I'm wrong, Counsel.

Do you personally have access -- when you are in your Dropbox employee account performing your duties, do you have access to the document that links the reviewer of People's 1 to the CyberTip in People's 1?

THE WITNESS:  It's less so much a document and more so a data table that I would need assistance from somebody else.

THE COURT:  But, again, that data table is subject to data retention policies of Dropbox; correct?

THE WITNESS:  That's correct.

THE COURT:  So if it exists, you can get there?

THE WITNESS:  With the assistance of a co-worker.

THE COURT:  Got it.

Go ahead.  And forgive me for intruding on your examination.

Q.  BY MR. BARTON:  Are there documents that Dropbox maintains that will show the job performance and reviews for the person -- job reviews of the person who

36.

did the review for CyberTip that's been identified as
Exhibit Number 1?

        MS. DAVIS:  Objection.  Relevance.

        THE COURT:  No.  Counsel, if you're going to
introduce Number 1, he's allowed to learn as much as he
can about Number 1 and the production of it.  Overruled.

        THE WITNESS:  Sorry.  Can you repeat?

    Q.  BY MR. BARTON:  Yes.

        Does Dropbox maintain records regarding the
performance and quality and performance issues for the
person who conducted the review that resulted in CyberTip
Exhibit Number 1?

        MS. DAVIS:  Objection.  He's testified he
doesn't know who that person is.  Lack of personal
knowledge.

        THE COURT:  This is about policies and
procedures as to --

        MS. DAVIS:  That's not how I understood it,
Your Honor.

        THE COURT:  Well, how did you understand the
question?

        MS. DAVIS:  It's whether or not Dropbox
maintains records for the person who created the CyberTip
that has been put forth as People's 1.  That's a specific
person.

        THE COURT:  Another way of saying it,

**ROUGH DRAFT**

37

Mr. Wulff, is does Dropbox have a policy of maintaining
job performance records of people who act as reviewers of
this type of material?

THE WITNESS:  Yes.  But, again, it's dependent
on retention policies as well as, you know, who is and
isn't employed at Dropbox anymore.

THE COURT:  Understood.

Go ahead.

Q.   BY MR. BARTON:  Do you have Exhibit Number 1 in
front of you?

A.   The CyberTipline report?

Q.   Yes.

A.   Yes.

Q.   Looking at the front page of that, is that
something that's generated by Dropbox?

A.   I believe you already called out that this is a
document from NCMEC.

Q.   And going to page 2, which says "Contents,"
that's not something that's generated by Dropbox?

So I'm talking about the second page, not the
page that has the number 2.  I'm talking about the page
that's on the back of the cover that says "Contents."

A.   Second A, Section B, and Section C?

Q.   Well, no.  I'm talking about the page before
Section A that's marked "Contents."

A.   This page right here?

**ROUGH DRAFT**

Q.   Correct.

THE COURT:   That appears to be what he's looking at.

THE WITNESS:   Some of these things are what Dropbox provides to NCMEC.

Q.   BY MR. BARTON:   So looking at pages that are numbered pages 1 through 5, does that contain NCMEC's report of information that was provided by Dropbox?

A.   Could you rephrase the question, please?

Q.   Yes.

Does the pages numbered 1 through 5 reflect NCMEC's report of information provided by Dropbox?

A.   If you're referring to uploaded file information --

Q.   I'm looking at all of Section A.

THE COURT:   You want to approach with that document and just show him what you're talking about?

MR. BARTON:   Sure.   Approaching the witness.

Q.   BY MR. BARTON:   Do you see a portion that's marked as Section A?

A.   Right here on the same page?

Q.   No.   Referring to here.   And then there's page numbers there.

So looking through page 1 through 5, is that NCMEC's report of the information provided by Dropbox?

A.   The information with each of these pages and

uploaded file information is information provided by Dropbox.

Q.   And when we say "provided by Dropbox," how does it get from the content reviewer to NCMEC?

A.   A reviewer reviews content and classifies it. And upon that classification, a CyberTip is generated.

Q.   So it looks like the submitter is identified as Dropbox legal team.   That's in the first section of Section A on page 1.   Is this submitted by Dropbox legal team?

A.   Content safety is a function of the legal team, yes.

Q.   So are the reviewers part of the Dropbox legal team?

A.   Under the umbrella of the legal team, yes.

Q.   So does the reviewer him- or herself submit the material to NCMEC, or does it go through any intermediates between the reviewer and the filing of the CyberTip to NCMEC?

A.   I'm not sure what an intermediary would be here.   Could you clarify, please?

Q.   Well, what I'm asking is, in May of 2020, did the content reviewer directly file the report to NCMEC? Or did the content reviewer give the results of their review to some other person, and that other person provided the information to NCMEC?

**ROUGH DRAFT**

40

A.  Another person did not provide the information to NCMEC.

THE COURT:  So it goes directly from the reviewer to NCMEC?

THE WITNESS:  When a reviewer reviews and classifies the content, upon that action, it gets directly submitted to the NCMEC.

THE COURT:  Thank you.  I think that's precisely what he was asking.  Thank you.

Q.  BY MR. BARTON:  Now, in some of these, if we look at -- well, let's look at the first one on page 2. There's a file that's identified as "uploadlog.csv."

A.  I see it.

Q.  And there's a question:  "Did reporting ESP," meaning electronic service provider, "view entire contents of the uploaded file?"  And the answer is "Yes."

What is the procedure employed by Dropbox to make sure that the reviewer actually reviewed the entire file?

A.  The only way for this question to be answered as yes is if a reviewer has reviewed and classified the content.

Q.  So let's say that we're talking about a video. It looks like the second one is an MP4, which is probably a video; right?

A.  Correct.

ROUGH DRAFT

Q.   So let's say that the viewer reviewed the first three seconds on that video and, based on that, was able to make a classification and didn't review the remaining three minutes of the video.  How would we know whether that occurred?

A.   Based on our training, we are required to.

Q.   So based on -- do you know what the -- so you don't know who trained this reviewer; right?

A.   I do not.

Q.   And you don't know what type of quality control there was for this reviewer in May 2020; correct?

MS. DAVIS:  Objection.  Asked and answered.

THE COURT:  Sustained.  I believe that has been answered previously.

Q.   BY MR. BARTON:  Is the entry of "yes" to that question data that's input by the reviewer him- or herself?

A.   No.  That is generated upon classification and submitting the review.

Q.   What does that mean, "generated upon classification"?

A.   NCMEC has an API that Dropbox uses that, again, upon classification of CSAM, will generate this answer.

THE COURT:  Can I just -- for my own clarification?

You've got to help me with the acronyms.  API?

**ROUGH DRAFT**

THE WITNESS:  I'm actually not 100 percent sure
on the acronym myself, but it is a --

THE COURT:  What does it refer to?

THE WITNESS:  It is basically the CyberTipline
form.  So if you have go to the website of NCMEC, you can
kind of manually upload the file, et cetera, et cetera.
This kind of automatically does that upon somebody
reviewing something.

THE COURT:  So if I -- may I?

If I understand the path of your testimony on
this point, going back to his earlier question, let's say
there's a video that's three and a half minutes.  The
reviewer watches the first 30 seconds and says, Oh, yeah
that's A2 or whatever, uploads it, the A2 judgment, as it
were, to the NCMEC file.  Then NCMEC generates the "yes"
as to the review of the file?

THE WITNESS:  Not quite.  If we classify
something as A2, it would be marked as "yes."

THE COURT:  Okay.  Forget about what
classification I chose.  Just the fact of a
classification --

THE WITNESS:  Correct.

THE COURT:  -- would generate from NCMEC a
"yes, reviewed the entire file" notwithstanding that the
person stopped three minutes before the end of the file,
the reviewer?

**ROUGH DRAFT**

THE WITNESS:  I would not say that NCMEC is answering that question.

THE COURT:  Okay.  So it's the reviewer answering the question by uploading a "yes"?

THE WITNESS:  The answer "yes" is caused by the reviewer's classification.

THE COURT:  Got it.  I think I understand.

Go ahead.

Q.  BY MR. BARTON:  So that would be a default answer that is put in based on the form that NCMEC has the reviewer fill?

A.  Yes.  If something falls between A1 and B2, the answer would be yes.  And if it is not considered CSAM, then nothing happens.

Q.  So the answer "yes" is not something that is input by the reviewer.  It is something that's generated by the NCMEC report form?

A.  Yes.  But it is not generated by NCMEC themselves.  It is generated by a tool that we use due to our action.

THE COURT:  That is to say the classification that's imposed by the reviewer is what triggers the default answer; is that correct?

THE WITNESS:  Correct.

THE COURT:  Thank you.

Q.  BY MR. BARTON:  So if a reviewer reviewed a

**ROUGH DRAFT**

portion of a file and reached a classification, it would indicate "yes" regardless of whether the reviewer actually reviewed the entire file; is that correct?

A.   Yes.

THE COURT:   Regardless of what classification they reach?

THE WITNESS:   If it falls between A1 and B2, then yes.

THE COURT:   Okay.

Q.   BY MR. BARTON:   And when you say "between A1 and B2," you mean whether it's classified A1, A2, B1, or B2, any of those four classifications result in "yes" appearing in the CyberTip report?

A.   That's correct.   That falls under CSAM.

Q.   Looking back at Exhibit 1, the NCMEC report -- and I'm looking at the page numbers on it.   So I'm looking at pages 6 and 7.   Are pages 6 and 7 information generated by NCMEC and not by Dropbox?

A.   6 and 7 is referencing Section B portions?

Q.   Yes.   Yes.

A.   These are describing classifications and definitions.   I believe these are on -- page 6, I believe, is provided by NCMEC.   And portions of page 7, like the file name, are provided by Dropbox.

Q.   So there's a categorization column, Section B on page 7.   And regarding all except two of the files

**ROUGH DRAFT**

that are addressed, the categorization is unconfirmed; is
that correct?

    A.  That's how it reads, but I'm not sure who is
providing that.

    Q.  And as to another, the categorization is "child
unclothed," correct, the third one -- no.  The second
one?

    A.  Correct.

    Q.  And as to the fourth one, it says "apparent
child pornography"?

    A.  Correct.

    Q.  And as to all the remaining ones, presumably
another 10 or 12, it's unconfirmed; correct?

    MS. DAVIS:  Objection.  He testified he doesn't
know what that -- where that comes from.

    Q.  BY MR. BARTON:  Correct?

    MS. DAVIS:  I just objected.

    THE COURT:  I think he's not asking where it
comes from.  He's asking what the report says.

    MS. DAVIS:  I think it's a different question
because he's asking is it unconfirmed, an answer to that
question.

    THE COURT:  I don't have the document in front
of me, so it's hard for me to follow along.  But --

    MR. BARTON:  If it's okay with opposing
counsel, I'll provide a copy of the report to the Court.

**ROUGH DRAFT**

46

MS. DAVIS:  That's fine.

THE COURT:  Thank you.

And we're talking about which page?

MR. BARTON:  Page 7.  The page numbers are in the upper right-hand corner.

THE COURT:  Yeah.  There's -- this is the page 7 I'm looking at.  Am I looking at the right page?

MR. BARTON:  No.

THE COURT:  What a surprise.

MR. BARTON:  It's the second page of Section B. I hope I gave the Court a full copy.

THE COURT:  You might want to take a second look at this.

MS. DAVIS:  Your Honor, can I just give you my computer for now?

THE COURT:  Sure.

Here's what I have as Section B, Mr. Barton. Yeah.  That's not what's on that page 7.

MR. BARTON:  It is not what's on that page 7. This appears to be different from Exhibit A -- Exhibit 1. I'm sorry.

THE COURT:  That's okay.  I get it.

MR. BARTON:  I don't know why there are different copies in existence of --

THE COURT:  I'm the one who is in the dark here, Mr. Barton.

**ROUGH DRAFT**

MR. BARTON:  Well, I'm in the dark on that issue as well.

THE COURT:  Can I make a suggestion?  Why don't with take a break.  Let's take a break until 11:00 o'clock.  You guys can get the documents in order.

I understood, just for your edification, Ms. Davis, much of this testimony and questioning goes to the motion to suppress more so than the prelim, and that has animated the rulings I've been making.

We're in recess.

MR. BARTON:  Thank you.

MS. DAVIS:  Thank you, Your Honor.

(The proceedings were in recess.)

THE COURT:  We're back on the record. People vs. Levy.

And you may continue your examination.

Q.  BY MR. BARTON:  Mr. Wulff, on Exhibit 1, the copy you have in front of you, there's a Section B.  That Section B is entitled "Automated Information Added by NCMEC Systems"; correct?

A.  Yes.

Q.  And the information there is not information provided by Dropbox?

A.  It doesn't sound like it, but the file names are file names from Dropbox.

Q.  If we go to the next section, Section C, that

**ROUGH DRAFT**

48.

section is entitled "Additional Information Provided by NCMEC"; correct?

A.   Yes.

Q.   And the NCMEC classification is "Apparent Child Pornography (Unconfirmed)"; correct?  That's in the first field?

A.   That's what it says here.

Q.   And the information other than the file names --

A.   There's a second line there as well.

Q.   It says, "Files Not Reviewed by NCMEC"; correct?

A.   Correct.

Q.   And the information in Section C other than the file names is not information that was provided by Dropbox; correct?

A.   That's correct.

Q.   When -- how does a file get initially flagged for review in May of 2020?

A.   At that time, there's a variety of ways, one of which could be a user report.  So what that means is somebody, you know, flagging or reporting a Dropbox link to Dropbox themselves.  Another means, at the time, could be through, you know, industry-wide detection methods. Like, a very common one is called PhotoDNA, which uses hash-matching technology.  I can't think of other means

**ROUGH DRAFT**

49

at the moment.

Q.  Does the information by Dropbox include the date and time when the file was accessed or downloaded or uploaded?

A.  I'm not sure at the moment.

Q.  Do you know by looking at Exhibit A or some other record when the reviewer actually received the report regarding the files that were the subject of the CyberTip?

A.  Could you rephrase?

Q.  Sure.

Do you know when the reviewer who reviewed the files that resulted in the CyberTip that's Exhibit No. 1 actually conducted their review?

A.  At this moment in time, I don't know.

Q.  Other than the answer "Yes" regarding "Did ESP view entire contents of uploaded file," is any other part of the information contained in Exhibit A -- strike that -- of Section A of Exhibit 1 automatically generated?

A.  Upon classifying and reviewing content, if it is true CSAM, things like an IP address would be populated just in the same way that the answer "Yes" would be populated.

Q.  One of the things that they have for each file is "Did Reporting ESP view the EXIF of uploaded file?"

**ROUGH DRAFT**

Do you see that?

A.   Yes.   And it says the information is not
provided by the company.

Q.   Right.   Does the EXIF file indicate when the
image or video was created or when it was reviewed?

MS. DAVIS:   Objection.   Relevance.

THE COURT:   Yeah.   I'm not sure what an EXIF
file is.

Q.   BY MR. BARTON:   Then let me try this question:
Can you tell us what an EXIF file is?

THE COURT:   Thank you.

THE WITNESS:   I actually can't.   It doesn't
look like it's information provided.

THE COURT:   That is, when you say "It doesn't
look like it's information provided," by Dropbox?

THE WITNESS:   I'm assuming when it says not
provided by company, "company" here is referring to
Dropbox.

THE COURT:   Thank you.

You have to remember you guys have the
advantage of looking at that.   I'm in the dark over here.
Thank you.

Q.   BY MR. BARTON:   Do you know whether the
reviewer who is reviewing the material has access to this
EXIF file?

MS. DAVIS:   Objection.   Relevance.   Lack of

51

personal knowledge.

THE COURT:  Yeah.  I'm not sure it is relevant because if I understand correctly, the document indicates that that file is not created by Dropbox.  So I'm not sure what is it they're accessing.

Q.  BY MR. BARTON:  Do you know what an EXIF file is?

MS. DAVIS:  Same objection.

THE COURT:  That's overruled because it may be foundational to the whole thing.  I don't know.

THE WITNESS:  No.

THE COURT:  You folks have the disadvantage of coming into the most computer illiterate courtroom in the entire building.

MR. BARTON:  I have no further questions for this witness.

THE COURT:  Thank you.

Anything else, Ms. Davis?

MS. DAVIS:  Very briefly, Your Honor.

THE COURT:  Please go ahead.

### REDIRECT EXAMINATION

Q.  BY MS. DAVIS:  Is it Dropbox's policy and procedure that the reviewer review the entirety of the file?

MR. BARTON:  Objection.  Vague as to time.

THE COURT:  I'm assuming it's based on -- the

**ROUGH DRAFT**

question is based on his current knowledge and his understanding that the procedures haven't changed.

        Is that the thrust of your question, ma'am?

        MS. DAVIS:  Yes, Your Honor.

        THE COURT:  I'll allow it.  Go ahead.

        THE WITNESS:  Yes.

    Q.  BY MS. DAVIS:  And lastly, then, from looking at People's 1, is it your opinion that this is, in fact, a CyberTip generated or the information contained within generated from the Dropbox legal team?

    A.  The information in this CyberTip?

    Q.  So basically is this a CyberTip that was generated based on information from Dropbox?

    A.  Yes.

        MS. DAVIS:  Nothing further, Your Honor.

        THE COURT:  All right.  Thank you.

        Mr. Barton, anything else?

        MR. BARTON:  Yes.

### RECROSS-EXAMINATION

    Q.  BY MR. BARTON:  Exhibit 1 isn't a Dropbox file, isn't a Dropbox document; correct?

        MS. DAVIS:  Objection.  Asked and answered.

        THE COURT:  Yeah.  I'm aware it's not a Dropbox file.

    Q.  BY MR. BARTON:  And some of the material contained in this was not created by Dropbox?

**ROUGH DRAFT**

53

MS. DAVIS:  Objection.  Asked and answered.

THE COURT:  Yeah.  Sustained.  We already have those in.

MR. BARTON:  All right.

THE COURT:  It's -- the tip is generated based on information from Dropbox, but not everything in the tip was provided by Dropbox.

MR. BARTON:  Right.

THE COURT:  Even somebody as slow as me could keep up with that.

MR. BARTON:  The purpose of my asking was to try to show that this doesn't qualify as a business record of Dropbox.

THE COURT:  No, I understand that.

MR. BARTON:  Then I have no further questions.

THE COURT:  All right.  Thank you.

Anything else then, ma'am?

MS. DAVIS:  No, Your Honor.

THE COURT:  May this witness be excused?

MS. DAVIS:  Yes, Your Honor.

MR. BARTON:  Yes, Your Honor.

THE COURT:  Thank you very much, Mr. Wulff.  We appreciate the time you've given us and your patience with all of us.  You are excused.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Next witness.

**ROUGH DRAFT**