IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:23CR65-CMH |
| | ) | |
| JAMES MEEK. | ) | |

## DEFENDANT'S POSITION ON SENTENCING

James Meek, through counsel, respectfully submits this sentencing memorandum. For the

reasons stated in this memorandum, this Court should impose the mandatory minimum sentence

of 60 months incarceration.  In support of his position, Mr. Meek states as follows:

### INTRODUCTION

"I had always considered James to be an honest and patriotic public servant . . . I
have been deeply impressed by his candor and willingness to accept responsibility
for his actions. He has not made excuses for his behavior nor has he sought to
deflect blame: he has owned his guilt and acknowledged the justness of punishment
for his actions."

> *Mark E. Mitchell, Colonel, US Army (Ret.)*
> *Recipient, Distinguished Service Cross*
> *Former Director for Counterterrorism, National Security Council;*
> *Former Acting Assistant Secretary of Defense, Special Operations*
> *and Low-Intensity Conflict*

"In my opinion, your Honor, I feel James Meek is a hero, who put his personal
reputation on the line for my family . . . This is not the only time that James has
used his position as an investigative journalist to help families in need . . . James
has told my wife and I that he deeply regrets his behavior and acknowledges the
actions that have caused such pain and sorrow to his family and friends.  James
fully realizes that his behavior was inexcusable and truly regrets what he has done."

> *Raymond J. Gannon*
> *Special Agent, FBI (Ret.)*

"In subsequent phone conversations, after James was arrested, he talked about the
shame. He also talked about the need to show friends and family the importance of
admitting responsibility. He talked about how, not only unethical his behavior was,

1

but also criminal, and how he needed to be punished. He was clearly remorseful."

> *Allan Lengel*
> *Former Reporter, Washington Post*

Mr. Meek acknowledges the seriousness of his criminal conduct, and he has expressed profound remorse for his actions. He has apologized to the victims–individuals who are harmed each time individuals like Mr. Meek download and view the images and videos at issue. Mr. Meek recognizes and accepts that he must pay a serious price for his conduct, which is completely at odds with his values and the way he has lived his life.

In imposing a sentence that is sufficient, but not greater than necessary, retribution is only one of many factors that must be considered. The Court should also consider Mr. Meek's history and characteristics. Mr. Meek has been a loving, present and devoted father to his two daughters. Over the course of more than 30 years, Mr. Meek has also dedicated himself to his profession as an investigative journalist committed to telling the stories of those who had been wronged, and unafraid to expose abuse of power within the government. More important than any professional accolades he received, Mr. Meek earned a reputation as a journalist who held himself to the highest professional and ethical standards, which were never questioned in the course of his career. Through his work, he won the trust, respect, and friendship of many—including those who have served this country at the highest levels of government, law enforcement and the military.

But that is not all. What truly sets Mr. Meek apart is his willingness—again and again—to step up and help those in need. "[F]or James, it was never about recognition; it was about giving aid to those in need, at any personal cost." Exhibit 1—Character Letters, at 6—Letter of Andrew Fredericks. Among those he helped were Gold Star families seeking the truth about the deaths of fallen service members, victims of war crimes, the families of American hostages kidnapped abroad, and, most recently, US-trained Afghan partner forces and their families, targeted by the Taliban for fighting side-by-side with US troops. "He made a real difference for good in those

2

cases." Ex. 1 at 22—Letter of Robert Klamser.  As will be detailed in the discussion that follows, Mr. Meek did not merely help with his skills and resources as a journalist; instead, he provided aid in often private ways and "remained supportive in the lives of people whose stories he highlighted long after the headlines passed, offering the support and assistance he could provide to ease their pain, promote healing and to pursue justice on behalf of their loved ones." ECF 27-4—Letter of Rev. Kathleen Day regarding pretrial release.  Mr. Meek's criminal conduct in this case is completely at odds with his proven personal values.

As he stands before the Court, Mr. Meek has lost nearly everything.  His "actions have shattered his professional reputation, caused grave scandal to his family, and caused many friends to abandon him." Ex. 1 at 7-8—Letter of Col. Mark Mitchell.  Mr. Meek knows and accepts that these are the consequences of his actions—consequences that are fully deserved.  Yet, Mr. Meek's family, along with many friends and colleagues who have come to know him well, continue to stand by Mr. Meek.  They know that he is remorseful, is committed to rehabilitating himself, and that he will never again violate the law.

We respectfully submit that a sentence of 60 months incarceration, followed by 10 years of supervised release, is the appropriate sentence in this case.

## THE SENTENCING GUIDELINES

Consistent with the plea agreement in this case, the offense level in this case is 34.  PSR ¶ 87.  Mr. Meek has no criminal history, and the advisory guidelines range is therefore 151-188 months.

The district court may not presume a sentence within the guidelines to be reasonable.  *Gall v. United States*, 552 U.S. 38, 50 (2007).  The court must calculate the applicable guidelines, but it may not rely solely on the guidelines range for determining the sentence to be imposed. *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007) (citation omitted).  Instead, all factors under §

3553 must be considered by the sentencing court. In considering these factors, section 3553(a) directs the sentencing court to "impose a sentence *sufficient but not greater than necessary*" to comply with the purposes of sentencing as set forth in the Sentencing Reform Act (emphasis added). In doing so, the Court must consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from future crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the Guidelines; (5) Guidelines Policy Statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution. 18 U.S.C. § 3553(a).

In this case, the advisory guidelines provide for an excessive sentence, inconsistent with section 3553(a) directive to impose a minimally sufficient sentence. Courts have long recognized that the child pornography guidelines provide for excessive sentence for first-time offenders. *See, e.g.*, U.S. Sent'g Comm., Results of Survey of U.S. Dist. Judges, Jan. 2010 through Mar. 2010, Question 8 (June 2010) (finding that 70% of United States District Judges believe Guideline range for child pornography possession is too high and 69% of United States District Judges believe range for child pornography receipt is too high). U.S. Sentencing Comm'n, Report to the Congress: Federal Child Pornography Offenses 7 (Dec. 2012) ("[D]efendants sentenced under the non-production child pornography guidelines have received sentences outside of the applicable guidelines more frequently than defendants in all other major types of federal criminal cases.").

Instead, for the reasons that follow, a sentence of 60 months is appropriate in this case.

## THE 3553(a) FACTORS

### I.   Mr. Meek's Personal History and Characteristics.

> [I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006), *aff'd,* 301 F. App'x 93

(2d Cir. 2008).

**David H. Sharrett, a Gold Star father who was Mr. Meek's friend and mentor for 40 years,** writes that service of others "is a thread we know that runs through James's life. It speaks of sacrifice and loyalty. We know that James has had a deep connection to those who've served to protect our country and a willingness to help people in need." Ex. 1 at 30—Letter of David Sharrett.

### A. Mr. Meek's family.

Mr. Meek is 54 years old.  He was born in Chicago, Illinois, but moved to McLean, Virginia soon after his birth.  PSR ¶ 99.  Mr. Meek's father, John Martin Meek, was a veteran of the Korean War who went on to have a career in politics and public relations.  *Id*.  Mr. Meek's grandfather, Brig. Gen. James H. Isbell, commanded a bomber group in World War II—a group that lost 300 men in action in only one year.  Growing up with these war heroes, and others, Mr. Meek developed a deep sense of compassion for those who have suffered the hidden wounds of war, including post-traumatic stress disorder and the grief of losing a loved one in war.  This sense of compassion motivated Mr. Meek, as a teenager, to volunteer at the Vietnam Veterans Memorial.  As discussed below, later in Mr. Meek's life, it was this sense of compassion that motivated to work tirelessly to help those who have suffered from war.

Mr. Meek's mother, Reed Isbell, worked in national politics, and later as an editor for the Smithsonian Institution.

In 2001, Mr. Meek married Jessica Lenard. PSR ¶ 102. Together, they had two daughters, ages 20 and 16. PSR ¶ 103. Mr. Meek's older daughter is a university student in Scotland. *Id.* Mr. Meek's younger daughter is a junior in high school, and a state champion varsity athlete. *Id.* Mr. Meek and Ms. Lenard divorced in 2012, but have shared custody of their daughters since that time. PSR ¶ 102. Mr. Meek has been a doting father he regards as the "two people most important to him" and has been involved in every aspect of his daughters' lives. Ms. Lenard writes

> Mr. Meek consistently strived to be an active and involved parent in our children's lives. In fact, during our settlement negotiations Mr. Meek made certain to not become the "every other weekend" father and insisted on having time during the week with the children as a means of being engaged in the everyday activity of their lives. From the time they were infants he made it a priority to be present at the important milestones. He attended parent-teacher conferences, brought them to school, sports practices, games, as well as theater and musical productions - offering encouragement and support.
>
> ***
>
> Mr. Meek has been a source of unwavering support for our children's dreams and aspirations. He has encouraged them to pursue their goals and helped to foster an environment in which they feel empowered to reach for their dreams. Mr. Meek is a loving and dedicated father who has consistently recognized our children's well-being, happiness and growth. I firmly believe that the qualities that have defined his parenting over the years to be reflective of his overall character.

Exhibit 1 at 1-2–Letter of Jessica Lenard.

As Mr. Meek has explained to the Probation Officer, one of the most difficult aspects of his offense is the pain and embarrassment his actions have brought to his daughters. PSR ¶ 72 ("He recognizes he let many people down, especially his daughters."). The offense in this case is particularly difficult for Mr. Meek's children because it comes as a total shock, completely at odds with the loving, supportive, and conscientious father who has always taught them to have to have integrity and do the right thing. PSR ¶ 103 (noting that Mr. Meek reported his daughters were

"devastated by his arrest for the instant offense, and have been attending counseling to manage the depression and anxiety they have experienced as a result."); *see also* Ex. 1 at 23—Letter of Scott Dance (noting that the offense "has exacted a tremendous toll on the emotional wellbeing of both his children.").

**Andrew Fredericks, an award-winning journalist and filmmaker who worked closely with Mr. Meek**, writes "I knew James to be a loving and dedicated father. His daughters are his shining pride, and his love for them is a reason that I believe that James has done and will continue do all in his power to overcome whatever trauma had contributed to his crimes" Ex. at 6–Letter of Andrew Fredericks.

### B. Mr. Meek's professional background and accomplishments.

#### 1. Mr. Meek's distinguished career as an investigative journalist.

Mr. Meek attended college at Virginia Commonwealth University, where he majored in illustration. PSR ¶ 101. Although Mr. Meek had a passion for visual arts and was a talented illustrator, he initially lacked motivation and struggled academically. *Id.* This changed dramatically over time and after graduation, Mr. Meek began working as a freelance artist and journalist. *Id.*

Driven by his life-long interest in history, politics, and world affairs, Mr. Meek saw journalism as a way to seek out the truth, challenge authority, and motivate positive change. He felt he had found his true calling when he became a reporter. *Id.* A series of tragedies that personally affected Mr. Meek propelled him on a course towards activist journalism: In 1993, three Christian missionaries Mr. Meek recently met while he was hiking from Panama into Colombia were kidnapped and eventually executed by FARC, a narco-terrorist group. The same week, a Pakistani national opened fire and killed two CIA officers in front of its headquarters near Mr. Meek's home. Then, in 1995, the Meek family lost a relative murdered in the Oklahoma City

Murrah Federal Building bombing.    By the time of the Millennium plot, he had already been reporting on terrorism for two years, and on September 11, 2001, he was at the scene interviewing military survivors of the Pentagon attack within a half hour of the plane hitting the building.

Beyond terrorism and war, Mr. Meek reported on national politics, criminal justice, national security, corruption, war, hostages, torture, human rights abuses, and other issues of national and international significance.  Throughout his career, Mr. Meek worked for a number of news agencies, including Law & Order Magazine, United Press International, All Points Bulletin News, the Los Angeles Daily Journal, the New York Daily News, and most recently ABC News. PSR ¶ 101.  Mr. Meek also worked in counter-terrorism for the United States Congress.

Mr. Meek has been nominated for six Emmy awards, one of which he won in 2017 for his reporting on the Orlando Pulse nightclub massacre.[1]  He has also received awards from the Overseas Press Club (2021), the Society of Professional Journalists (2016 and 2018), Investigative Reporters and Editors, Inc. (SPR-IRE, 2000), and the International Union of Police Associations (2002).  Mr. Meek was sought after to speak in front of Special Operations commanders at Little Creek, Virginia, and Marine Corps University, law of war experts at West Point and Notre Dame Law School, as well as major city police chiefs at the FBI's National Academy at Quantico.  As discussed in more detail below, in 2022 Mr. Meek was also selected to receive James W. Foley World Press Freedom Award for his reporting and his humanitarian efforts on behalf of families of American hostages and Afghan refugees.

During his 30-year career, Mr. Meek became known for determination, integrity, and courage as a reporter:

---

[1]     *See* https://www.imdb.com/name/nm8229289/awards (Emmy nominations and awards).

**Marion "Spike" Bowman, who in his 41 years of government service has served as Senior Counsel at the FBI and Deputy National Counterintelligence Executive**, writes of Mr. Meek's integrity as a journalist. "I was cautious with James as I was with others but during the intermittent contacts I had with him, I came to trust him not to try to pry information from me but I also observed within him something of a rarity today; as a journalist he would report only what was newsworthy and only with the facts that could be corroborated . . . the James I know always kept his word and he was always respectful." Ex. 1 at 16—Letter of S. Bowman.

**Andrew Fredericks** writes that "[i]n his professional pursuits as a journalist, [Mr. Meek] would tirelessly pursue the truth for those who have been wronged in some way." Mr. Fredericks also notes Mr. Meek's compassion and high standards as a journalist. Ex. 1 at 5—Letter of A. Fredericks.

**Colonel Mark H. Mitchell, a Green Beret who was one of America's most highly decorated warriors, and served as a Senior Advisor on counterterrorism in both the Obama and Trump Administrations**, states that "I had always considered James to be an honest and patriotic public servant, whether as a journalist or when serving as a congressional staffer." Ex. 1 at 7—Letter of Col. M. Mitchell.

**Allen Lengel, a former police reporter with the Washington Post**, writes: "There was a group of journalists from national media outlets who socialized together, and James and I were in that group. He had a reputation of being an outstanding and accurate reporter with immense integrity, and an all-around good guy." Ex. 1 at 25—Letter of A. Lengel.

**Reverend Kathleen Day, a Chaplain who has counseled and advised the family members of American hostages**, writes that "[i]n his reporting, he gained the trust of families and loved ones of hostages, service members, and those who supported our country's efforts

abroad, because he did not exploit their emotions nor risk someone's safety for a headline." ECF 27-4, at 1—Letter of Rev. K. Day.

### 2. Mr. Meek's service to the United States House Committee on Homeland Security.

From 2011 until 2013, Mr. Meek served as Senior Counterterrorism Advisor to the Chairmen of the US House Committee on Homeland Security, a position in which he held a Top Secret clearance. R. **Nicholas Palarino, a combat veteran who received the Distinguished Flying Cross and served as Staff Director on the Committee**, describes in his letter how Mr. Meek's work on the Committee "made a tremendous contribution to U.S. national security." As "one of many examples . . . where James made a tremendous contribution to U.S. national security," he discusses the FBI's Boston Marathon investigation. Ex 1. at 13–Letter of R. N. Palarino. He writes:

> I do not condone James' actions that have led to him to this point in his life. Rather, I contend that he has also done a great deal of good for our country. It is no understatement that he has saved American lives as a result of his work. I respectfully request the Court takes his past contributions into account as it moves forward to sentencing and consider the leniency they merit.

*Id.* (emphasis in original).

### C. Mr. Meek's history of exceptional good deeds and service to the community.

The letters submitted in this case illustrate how, far beyond the role of a typical journalist or producer, "many instances of how [Mr. Meek] used his position, talent, and knowledge for the benefit of others." Ex. 1 at 9—Letter of Rev. K. Day. As will be seen below, Mr. Meek was instrumental in saving human lives. And in the tragic instances where lives were lost, he repeatedly took on the loss and grief of those who had lost their loved ones in service to the United States. Many of the subjects of Mr. Meek's reporting regard him as a close friend, and in some cases almost like a family member.

### 1. The 2021 evacuation of at-risk Afghan Special Operations Forces and their families.

The James W. Foley Press Freedom Award for which Mr. Meek was selected in 2022, is unique in that it recognized Mr. Meek not only for his reporting, but also for his actions as a private citizen who stepped up to help save hundreds of lives after the Biden Administration's withdrawal of troops from Afghanistan: "The James W. Foley Legacy Foundation had planned to honor James Gordon Meek with its 2022 World Press Freedom Award for his years of foreign correspondence and his efforts to evacuate Afghan special operators and their families after the fall of Afghanistan in August 2021."[2]

**Nezamuddin Nezami, a former Afghan Green Beret trained at Fort Bragg, North Carolina**, was targeted by the Taliban for his decade of fighting shoulder-to-shoulder with American special operators. He details the lengths that Mr. Meek went to in order to help evacuate him from Afghanistan:

> The Taliban assassinated my friends with whom I received Special Forces training in the US and they were actively hunting me. James ensured my escape from Afghanistan. While a lot of people did not take time to help, James cared and took the time to help me. He helped me prepare my special immigrant visa [application] in 2020 and didn't stop there . . . We talked almost daily as James knocked on every door and called every contact he had in the Congress, the White House, the CIA and the State Department trying to get me evacuated from Afghanistan before my homeland fell to Taliban rule.

Ex. 1 at 10—Letter of N. Nezami. **Steve Lindsey, a former Marine and career diplomat who served as Special Assistant to both the Trump and Biden National Security Advisors at the White House**, recalls how Mr. Meek enlisted his help, along with other officials, to evacuate Mr. Nezami and his family:

---

[2]     Ben Ashford, 'Missing' ABC producer James Gordon Meek is seen in public for the first time since FBI raid, The Daily Mail (Nov. 1, 2022), available at https://www.dailymail.co.uk/news/article-11374411/Missing-ABC-producer-James-Gordon-Meek-seen-public-time-FBI-raid.html

> Though the US Embassy had promised to issue special visas to Afghan citizens, the process experienced a significant backlog. James went above and beyond, leveraging all possible resources to facilitate the evacuation of [Mr. Nezami's] family from Kabul. His commitment to helping this young man and his loved ones demonstrated his compassion and determination.

Ex. 1 at 27—Letter of S. Lindsey.

Mr. Nezami was one of more than 700 individuals, including hundreds of children, who

were evacuated thanks to the efforts of the heroic individuals that Mr. Meek helped to rally by his

forming of veterans' volunteer group "Task Force Pineapple." **Raymond Gannon, a retired FBI**

**Special Agent with 28 years of service**, writes

> James was instrumental in setting up the privately organized effort to extricate hundreds of Afghan national citizens from terror of the Taliban controlled Afghanistan. These brave men and women who served as interpreters and military partners to US forces in Afghanistan and were left behind by the US government were able to flee Afghanistan because of the help and assistance of James Meek and his comrades. James and his comrades took it upon themselves to honor the debt of gratitude owed by this country to these Afghan refugees.

Ex. 1 at 4—Letter of R. Gannon; *See also* Ex. 1 at 6–Letter of A. Fredericks ("during America's

disastrous withdrawal from Afghanistan in 2021, James was instrumental in helping save the lives

of numerous Afghani nationals who had worked alongside the US military, and would have likely

been executed by the Taliban. James worked in secret, night and day, to secure the safe passage of

numerous men and their families.").

In what should have been one of the highlights of his career, Mr. Meek completed work in

2022 on a book about the operation to save those Afghan refugees in the wake of the Biden

Administration's 2021 chaotic withdrawal of US forces from Afghanistan. Lt. Col. Scott D. Mann,

OPERATION PINEAPPLE EXPRESS: THE INCREDIBLE STORY OF A GROUP OF AMERICANS WHO

UNDERTOOK ONE LAST MISSION AND HONORED A PROMISE IN AFGHANISTAN (Simon &

Schuster, 2022). The book became an instant New York Times Bestseller after its release in

August, 2022. However, after learning of the government's investigation in April of 2022, Mr.

Meek did not want the impending charges to distract or detract in any way from the heroic stories of those involved. Mr. Meek asked the publisher to remove his name as an author of the book. Virtually all references to Mr. Meek and his role in the operation were scrubbed from the text. Mr. Meek also declined to receive the Foley Award. Having learned that he was under criminal investigation prior to the award ceremony, "Mr. Meek noted he would not be able to accept and we withdrew the honor."[3]

Difficult as these consequences were, Mr. Meek's motivation was never personal recognition. **Scott Dance, a writer and longtime friend**, writes that

> In conversation, James would not talk of Emmys or journalistic accolades. Instead, homeless and wounded veterans were usually the dominant topic. Alternately, he would speak with urgent concern about [Afghan] refugees–particularly ones he had personally befriended. Individuals who had cast their lot with US forces and then were summarily forgotten, though never discarded by James.

Ex. 1 at 24–Letter of S. Dance. Even after he resigned from his position at ABC News upon learning of the investigation in this case, Mr. Meek sent financial support to two Afghans and their families, hunted by the Taliban, who had fought alongside US Special Forces. In one of those instances, Mr. Meek's financial support allowed the individual to obtain life-saving medical care. **Nezamuddin Nezami** recounts that "when an elite member of Special Forces was shot by Taliban and was not able evacuate, James helped to find him and also sent him money to be treated. My friend did not get out of Afghanistan, but he survived because he used James's help to hire a doctor and get treatment." Ex. 1 at 11—Letter of N. Nezami.

### 2. Helping Gold Star families.

**Randy Ream, a former Assistant US Attorney who served as Criminal Chief in the Western District of Kentucky from 2010 to 2015**, writes of how Mr. Meek's "passion became helping the families of bereaved and missing US service men and women in getting answers about

---

[3]     The Daily Mail, *supra at n.2.*

what happened to their loved ones." Ex. 1 at 17—Letter of R. Ream. "James vowed to those families to find out the truth about what happened and why. Again, he spent hundreds of hours in that pursuit, and again he alone proved that the version provided by the military was largely fictitious." Ex. 1 at 6– Letter of A. Fredericks.

In one such case, Mr. Meek worked for over four years to investigate the fratricide death of a young soldier who hailed from Oakton, Virginia. **Andrew Fredericks** recounts

the years he spent (much of it on his own time) to uncover the truth behind the friendly fire death of a young solider named David H Sharrett II, who the Pentagon falsely claimed was killed by enemy combatants. Dave's father was broken and sensed he was being lied to. He turned to James, who vowed he would find out the truth. In the end, James did just that. Through his dogged dedication to fulfilling that vow, he proved that David had been accidently shot by his own commanding officer, a fact that was covered up by military officials.

Ex. 1 at 5–Letter of A. Fredericks. At the time of Private Sharrett's death, Mr. Meek developed a close bond with his father, who had been Mr. Meek's high school teacher.

**Private Sharrett's father, David** writes:

James worked tirelessly at great cost to give our son the voice that had been taken from him. It speaks to the kind of man we've known him to be. He did this because were friends and because he saw an enormous injustice that needed to be addressed. We could not have given Dave his voice without the sacrifice of time and energy that James gave.

Ex. 1 at 29—Letter of David H. Sharrett.

Similarly, nine years later, when Sgt. 1st Class Jeremiah W. Johnson and three of his comrades were killed in action in an ISIS ambush while serving with the US Army Special Forces in Niger, Mr. Meek was relentless in investigating this tragedy for over three years. The Pentagon had accused these brave men and their team of incompetence and going on a rogue mission which was claimed was intended to help free an American hostage. Mr. Meek's investigation helped to restore the valor and dignity of these four soldiers. **Debbie and Raymond Gannon**, Mr. Johnson's

14

mother and step-father, were introduced to Mr. Meek by Private Sharrett's father. Mr. Gannon

recounts a "time of grief and confusion":

> James worked tirelessly for over three years to finally uncover the deception and lies we had been told about the events that led up to the final battle that resulted in the deaths of four American soldiers on October 4, 2017.
>
> ***
>
> In my opinion, your Honor, I feel James Meek is a hero, who put his personal reputation on the line for my family and the families of the other three soldiers, Staff Sergeant Bryan Black, Staff Sergeant Dustin Wright and Sergeant La David Johnson.

Ex 1. at 3—Letter of R. Gannon.

**Terri Criscio, the mother of Staff Sergeant Dustin W. Wrigh**t, writes:

> Our family, as well as LaDavid, Jeremiah, and Brian's families, are forever grateful to James and his team for helping us clear our sons' names and their unit. His commitment to the truth and desire to bring light to the mistakes made by the chain of command is the only reason we have the truth. I know there are other families James has helped in the same way as ours.

Ex. 1 at 14—Letter of T. Criscio.

To be sure, Mr. Meek was in a unique position to help Gold Star families because of his

skills, resources, and the public platform he had as an investigative reporter at ABC News.

**Colonel Mark Mitchell, who served as a senior Trump Pentagon official** during the period

covering the 2017 attack by ISIS fighters, notes that the documentary Mr. Meek helped to create

> was a service to the Republic and to the truth. James correctly assessed that the Pentagon investigation had been hopelessly inadequate and unjustly tarnished the valor, patriotism, and fidelity of those brave soldiers. . . . The documentary was a much needed corrective to an official account that was based on falsehoods and calumnies designed to protect senior officers from accountability. Secondly, it was an important correction for the families who lost loved ones in battle only to see their reputations callously and egregiously besmirched.

Ex. 1 at 7—Letter of Col. M. Mitchell.

However, "[w]hile his investigation was the basis for the award-winning documentary

*3212 Un-Redacted*, James's motivation was bringing some peace to people in pain." Ex. 1 at 6—

Letter of A. Fredericks. Mr. Meek was driven by "his genuine concern for and connections with

these families." Ex. 1 at 7–Letter of Col. M. Mitchell.  Indeed, Mr. Meek always put the privacy

and well-being of these families above his reporting.  First and foremost, he was a true friend who

connected with them in their pain and grief.  **Andrew Fredericks, the co-producer of the**

**documentary**, recounts:

> While working with James, I would often hear of him spending hours on the phone with weeping parents or wives, who needed someone to listen. He would drive hundreds of miles to attend a funeral or a dedication ceremony. He once rightfully scolded me when I wanted to film the father of a fallen soldier being evicted from his home. "His pain is far too great for you to film. I won't allow it," he insisted. His empathy outweighed our need for footage.

Ex. 1 at 6–Letter of A. Fredericks.

**Terri Criscio** echoes this observation, writing that more than a journalist who reported on

her son's death, "I consider James my friend, one who helped me through the hard days of my

life." Ex. 1 at 14—Letter of T. Criscio.

### 3. Helping American hostages and their families.

Mr. Meek also gave his time and energy to the cause of American hostages over the course

of 30 years.  **Reverend Kathleen Day**, who met Mr. Meek in 2014 when four Americans were

being held hostage by ISIS, notes:

> James devoted an extraordinary amount of time and energy in reporting in such a way as to bring to light the concern, pain and ultimately, the grief of the families of the hostages held by ISIS. I trust you are aware of his many extraordinary and compassionate investigations and reporting on behalf of others who have felt justice ignored them.

Ex. 1 at 9—Letter of Rev. K. Day.

**Robert Klamser, a Christian Minister who has served in law enforcement and now**

**leads a faith-based hostage recovery organization** recounts that he has been familiar with Mr.

Meek's work on hostage cases, going back decades.  He writes that Mr. Meek "was committed to

doing good and in fact did do good." Ex. 1 at 22—Letter of R. Klamser.

Mr. Meek's investigations included:

***Three US Missionaries Kidnapped in 1993 by FARC***.  Three American missionaries were kidnapped and later murdered by a Colombian narco-terrorist group, FARC, in Panama.  Over several years when it was unknown whether these hostages were, Mr. Meek wrote and published numerous stories to help the victims' families keep this long-forgotten case in the public eye. Throughout the course of his investigation, Mr. Meek also provided confidential information to the hostages' families.  This would become Mr. Meek's practice over the decades to come, up to the date of his arrest of his arrest in this case.

***Robert Levinson***.  Robert Levinson was a retired FBI agent, working on a US government contract when he disappeared on Kish Island in 2007.  A dozen years after his disappearance, Mr. Meek wrote stories that helped his family confront the US government's failures to recover him, or hold the Iranian government accountable.[4]

***ISIS Executions of Western Hostages in 2014 and 2015***.  ISIS kidnapped and held two dozen Western aid workers and journalists captive in Syria.  For those they could not extract ransom for, they beheaded on video, including journalist James. W. Foley.  The last of four Americans killed in captivity was humanitarian aid worker Kayla Mueller.  Mr. Meek helped their families in a variety of ways, including giving them a platform to confront the US government for impeding the safe recovery of their loved ones, and providing information he gained from his confidential sources about their captivity and death, while events unfolded.

---

[4]     *See, e.g.*, James Gordon Meek, No body, no burial, no peace for Iran hostage Bob Levinson's family, ABCNews.com, https://abcnews.go.com/US/body-burial-peace-iran-hostage-bob-levinsons-family/story?id=76376460 (March 11, 2021) (last visited April 19, 2023); James Gordon Meek, Documents may be breakthrough in case of FBI veteran Robert Levinson, who vanished in Iran, ABCNews.com, https://abcnews.go.com/International/documents-breakthrough-case-fbi-veteran-robert-levinson-vanished/story?id=67169441 (Nov. 21, 2019) (last visited April 19, 2023).

Significantly, Mr. Meek facilitated the FBI and Department of Justice obtaining six hours of unedited interviews of two of the defendants from British filmmaker Sean Langan, while they were held by Syrian allies. The United States used this footage as its primary evidence identifying the defendants as the captors.[5] This led to their convictions in the Eastern District of Virginia.

*Jeffery Woodke*. In his investigation of the 2017 Niger ambush of a US Special Forces team, Mr. Meek debunked the Pentagon claim that the team had been searching for an American Christian aid worker, Jeffery Woodke, who was safely recovered in 2023. In the course of this investigation, Mr. Meek questioned many US and Nigerien officials about the sluggish efforts to recover Mr. Woodke. He gave Mr. Woodke's family a platform to address the captor network publicly. **Robert Klamser**, who was involved in Mr. Woodke's safe recovery credits Mr. Meek's involvement in the recovery:

> In connection with the case of an American missionary kidnapped by the al Qaeda franchise operating in Niger and Mali, I contacted Mr. Meek because I read some of his material and I thought he might be able to help me in this case. Mr. Meek did indeed agree to help. He shared his knowledge and perspective on the jihadist movement in the Sahel and provided information on specific persons of interest in this case. He also traveled, at his own expense, to Northern California to record a TV interview with the hostage's wife. This video was ultimately broadcast and delivered to the captor network and was, in my judgment, a significant part of the "package" that led to this hostage's safe release in March after 6 years in captivity.

Ex. 1 at 21—Letter of R. Klamser.

---

[5]     James Gordon Meek, Accused ISIS 'Beatle,' on trial for brutal kidnappings, faces mothers of American victims, ABCNews.com, https://abcnews.go.com/amp/US/accused-isis-beatle-trial-brutal-kidnappings-faces-mothers/story?id=83893964 (April 6, 2022) (noting that "prosecutors played video of interviews [one of the defendants] had voluntarily given.").

**Mark Frerichs**.  Mr. Meek helped to keep this case in the public eye as well as giving a platform to the Frerichs family to plead with the President to rescue Mr. Frerichs before the US exited Afghanistan in 2021.[6]  Mr. Frerichs was recovered in 2022.

In late 2022, long after he learned he was under investigation in this case, Mr. Meek advised people close to another American citizen taken hostage by the Taliban last year.  He called senior US officials' attention to the case and referred those close to the hostage to private individuals who could assist them.

As with his other humanitarian efforts, Mr. Meek always prioritized his role as a friend and resource to these families over his role as a journalist:

> From my conversations with James, it was evident that he remained supportive in the lives of people whose stories he highlighted long after the headlines passed, offering the support and assistance he could provide to ease their pain, promote healing and to pursue justice on behalf of their loved ones.

ECF 27-4, at 1—Letter of Rev. K. Day.

In sum, Mr. Meek is a "human being[] whose good deeds and character warrant recognition in sentencing."  *Mehta*, 307 F. Supp. 2d at 275.

## II.  The Nature and Circumstances of the Offense.

The offenses of conviction in this case are transportation of child pornography and possession of child pornography.  The conduct in this case involved downloading and viewing CSAM, as well as exchanging CSAM images and videos with other individuals on the internet.  Mr. Meek recognizes that the act of viewing and exchanging images and videos of minors further victimizes those individuals.  "He expressed remorse for the victims, stating that while he did not personally know any of the victims of his offense, he knows people who have been victims of

---

[6]     *See, e.g.*, James Gordon Meek, Hope dims for American hostage as US hastily exits Afghanistan, ABCNews.com, https://abcnews.go.com/US/hope-dims-american-hostage-us-hastily-exits-afghanistan/story?id=78291489 (June 19, 2021) (last visited April 19, 2023).

sexual abuse and the lifelong effects they suffer as a result. He stated he had an obligation to live a righteous life and failed to do so." PSR ¶ 72. A sentence of 60 months is a significant sentence for any individual, but particularly one who has never previously been charged with a crime. It is a sufficient sentence to account for the criminal conduct in this case.

In considering the nature and circumstances of the offense, we respectfully ask this Court to note that Mr. Meek has *not* been convicted of sexually abusing a child, engaging in enticement, or producing child pornography. This is because he has not, in fact, done any of these things. The government investigated these issues extensively over the course of more than two years. When the government obtained the indictment against Mr. Meek, more than three months after his arrest, the indictment contained no charges of enticement, production, or any other contact offense with a minor. By that point, the government had imaged and reviewed numerous devices seized from Mr. Meek's residence, and interviewed individuals across multiple states. Even after the indictment was returned, the government continued its investigation. As the Court is well aware, the government does not give a "pass" to individuals when it comes to these types of offenses, and this case is certainly no exception. In the end, the statement of facts accurately describes Mr. Meek's criminal conduct. Mr. Meek should be sentenced based on his actual conduct, rather than based on suspicions or intimations that he did something worse.

Several of the letters submitted to the Court discuss the personal cost to Mr. Meek of the work that he did. *See e.g.*, Ex. 1 at 29—Letter of D. Sharrett. To a large degree, that cost came in the form of his mental health. In 2017, years before Mr. Meek was ever investigated in connection with his conduct in this case, he spoke of the toll that his work was taking:

> As incredible as it may seem, in the past four years (2013-2017) terrorism has become an even more difficult subject to cover and also maintain my own emotional health and morale. Man's inhumanity to man met the smartphone in places such as Iraq, Afghanistan and Syria, and exposure to the carnage and cruelty of warfare has increased exponentially in my work because it has become so easy to document and distribute globally. It is both a

blessing and a curse. The blessing is being able to have a window on the battlefield; the drawbacks include lack of context and simple volume of cruelty and death imagery online.[7]

[REDACTED] In addition to footage he viewed in conducting investigations, there was also the grief and suffering of the families of those who had been killed or tortured, which Mr. Meek never hesitated to take on as if it was his own. [REDACTED]

[REDACTED]

It is notable that trauma has been found to lead to this type of emotional numbing, combined with an increased tendency towards impulsivity. *See, e.g.*, *Draughon v. United States*, 309 F. Supp. 3d 934, 938 (D. Kan. 2018) (noting that trauma is associated with increase in impulsivity). [REDACTED]

---

[7] Marian Sakhayan, Tenacity and Truth-Telling, El Vaquero (Nov. 29, 2017), available at https://elvaq.com/features/2017/11/29/tenacity-and-truth-telling/



Further, as is typical in cases involving this type of conduct, individuals are reluctant to seek out help both because of the shame involved and fear of the legal consequences.

While the foregoing issues by no means excuse Mr. Meek's conduct, they help to explain the constellation of factors that compromised his decision-making and contributed to conduct that was completely out of step with his history of kindness and service to others.

Mr. Meek embraces Dr. Boyd's recommendations and recognizes the fact that he has a long and difficult road ahead to work through these issues. The letters submitted to the Court confirm Mr. Meek's willingness to do the hard work that is necessary to change.

### III. Mr. Meek is Committed to Rehabilitating Himself and Abiding by the Law, and Presents No Risk of Reoffending.

**Doug Kimme, a Gold Star father and former combat veteran with 26 years of service as a police officer** writes: "I do have faith that Mr. Meek would abide by any Court imposed provisions for rehabilitation and move forward for his family and for himself. In my opinion, Mr. Meek still has much he can contribute to our Nation as well as a strong desire to get back on a good and healthy path." Ex. 1 at 20—Letter of D. Kimme. Mr. Meek poses no risk of reoffending.

#### A. Mr. Meek has expressed sincere remorse.

A defendant's expression of sincere remorse is a strong indication that the defendant will never reoffend. *See, e.g.*, *United States v. Keller*, No. CRIMA3:04CR233-G, 2005 WL 6192897, at \*7 (N.D. Tex. Oct. 17, 2005) ("He has expressed seemingly sincere remorse, so it appears that there is little chance for recidivism."). Mr. Meek accepted full responsibility and expressed his remorse not just to the Probation Officer, but to many of his close friends:

**Major James Gant, a US Army Special Forces retired commander who received the Silver Star for valor**, has provided spiritual guidance and support to Mr. Meek. He writes: "James has pleaded guilty and voiced remorse, a first step in the long road to taking responsibility for his actions. I believe that given time, counseling, and spiritual guidance, James has the potential to reenter society as a positive, contributing member." Ex. 1 at 18—Letter of J. Gant.

**Colonel Mark H. Mitchell** writes that Mr. Meek "

has not given into anger, self-pity, or blame shifting. In his letters to me and our phone conversations his remorse for his crimes is abundantly clear. In response, he has sought to re-orient his life, emotionally, intellectually, and spiritually, to find ways to make amends and emerge from this ordeal as a chastened and productive member of society once more.

Ex. 1 at 8—Letter of Col. M. Mitchell. *See also* Ex. 1 at 4—Letter of R. Gannon at 4 ("James has told my wife and I that he deeply regrets his behavior and acknowledges the actions that have caused such pain and sorrow to his family and friends. James fully realizes that his behavior was inexcusable and truly regrets what he has done."); Ex. 1 at 9—Letter of Rev. K. Day ("James' remorse and willingness to take responsibility are far more in character with the person I have come to know over the last 9 years, than the actions detailed in the charges in which he acknowledged guilt."); Ex. 1 at 22—Letter of R. Klamser ("I am impressed that he has admitted guilt and accepted responsibility for his actions."): Ex. 1 at 27—Letter of S. Lindsey ("James deeply regrets his actions and has shown remorse.").

### B. Mr. Meek has no criminal history.

Mr. Meek has no criminal history. He has had no prior contact with the criminal justice system, and has zero criminal history points. Based on this fact alone, Mr. Meek poses an exceedingly low risk of recidivism. The Sentencing Commission has recognized that individuals with zero points have a very low chance of reoffending. Accordingly, "informed by its studies of recidivism among federal offenders, as well as other extensive data analyses of offenders with no criminal history points," the Commission has recommended a 2-level decrease for offenders with no criminal history points.[8] While individuals convicted of sex offenses are excluded from this provision, which is codified in USSG § 4C1.1, the Court should nevertheless vary downward from the guidelines on this basis because the statistics show that like other offenders, first time child pornography offenders pose an exceedingly low risk of recidivism.

The rate of sexual recidivism among defendants convicted of non-production child pornography is only 4.3 percent. Charles R. Breyer et al., U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography: Non-Production Offenses* 65 (2021)[9]; *see also* Jérôme Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex Offending,* 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (0.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense).

In addition to this, while we submit there is no re-offense risk whatsoever, it is important to note that Mr. Meek will be subject to supervised release. On top of that, the level of public

---

[8]    *See* Amendments to the Sentencing Guidelines (April 27, 2023) at 89, *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly--amendments/20 2305_RF.pdf, at 81.

[9]    Available at:
https://www.ussc.gov/sites/default/files/pdf/research-and- publications/research-publications/2021/20210629_Non-Production-CP.pdf

scrutiny, which has also hurt his family, will be a further deterrent to any potential misconduct in the future.

**C.** 

### D. Mr. Meek has thoroughly demonstrated his commitment to rehabilitation and to following the law in all respects.

Mr. Meek's conduct in the wake of the law enforcement search of his residence shows that he will abide by the law, and poses no future risk of reoffending. The government searched Mr. Meek's home on April 27, 2022—nine months prior to his arrest. During those nine months, Mr. Meek was not subject to any restrictions on his freedom. Yet, knowing that he would face charges that would mean incarceration and public humiliation, Mr. Meek responded to the situation constructively.

Mr. Meek began attending two churches and sought counsel from a trusted member of the clergy as well as friends who are deeply involved in the church. *See* ECF 27-4—Letter of K. Day (noting that she has counseled Mr. Meek on spiritual and religious matters). He has continued on his spiritual path after his arrest and incarceration. *See* Ex. 1 at 4—Letter of R. Gannon ("James has sought counseling and spiritual guidance and is striving to ensure that his life going forward will be a better one as he attempts to restore his family."); Ex. 1 at 14—Letter of T. Criscio ("I believe James has already started down a path of recompense for his actions. Seeking spiritual

guidance and his volunteer work in the DC area is proof of his commitment to change his life's direction."). Mr. Meek also sought out psychological therapy during the period prior to his arrest, and took steps to improve his physical and mental health. PSR ¶ 109; *see also* Ex. 1 at 26—Letter of A. Lengel ("we talked about the pain he was dealing with and the soul searching and his willingness to address these issues through meditation, religion, and therapy.").

Mr. Meek has also shown the willingness and the ability to conform his conduct to the law. Although he was under no restrictions and no obligation to report to the government in any way, Mr. Meek took proactive steps to be cooperative with the government while the government investigated his case. Mr. Meek: continued to reside in Northern Virginia, and voluntarily informed the government when he moved from his apartment to his mother's residence; always returned to Virginia after traveling within the US; volunteered to surrender his passport to the government, though not required to; relinquished possession of his lawfully-owned and registered firearms, though not required to; maintained close ties with his family, including supporting his 15-year-old daughter, and taking care of his mother after she underwent surgery; resigned from his position at ABC News but continued to work on a freelance basis in order to support his daughters, and continued to find ways to serve others in need, including volunteering with homeless veterans, supporting friends with health problems, consulting on a publicly undisclosed US hostage case, and providing financial and moral support to Afghans who remain in danger, as well as those who were able to escape to safety.

These actions show beyond any serious doubt that Mr. Meek will continue to work hard to rehabilitate himself, and will assiduously follow all of the rules and restrictions imposed by the Court.

### E. Mr. Meek has significant community support.

Despite the nature of his crime, Mr. Meek continues to have the support of his family and many of his friends and former colleagues. They have committed to being there for Mr. Meek during his incarceration and beyond. *See* Ex. 1 at 18—Letter of Maj. J. Gant ("I am committed to meeting with James weekly during his incarceration to support his journey toward self-discovery and redemption as a child of God. Despite the challenges he will face, I will stand by James."); Ex. 1 at 8—Letter of Col. M. Mitchell ("As a friend, I continue to support and pray for James. Throughout his incarceration and beyond, I look forward to staying in touch with him and assisting him on his journey of redemption—a journey to which he is irrevocably committed. I sincerely hope that you will favorably consider my assessment of James' contributions and disposition as you impose a just sentence on him."); Ex. 1 at 9—Letter of Rev. K. Day ("I will continue to support and encourage James during his sentence and upon his release, as I believe he will continue a life-long journey to make amends and to contribute to a better understanding of the culture of harm that entangled him, and to use his experience, knowledge, and skills in constructive and meaningful ways that benefit individuals and society."); Ex. 1 at 6—Letter of A. Fredericks ("While I abhor his transgressions, I stand will by him, and try to help him overcome and grow, both while he is incarcerated and after his release.").

Not only is the strength of Mr. Meek's support a testament to his character, it is a "strong support system in place to help him reintegrate into society." Ex. 1 at 27—Letter of S. Lindsey.

In sum, all of these facts overwhelmingly show that Mr. Meek presents no risk of recidivism.

## IV.    A Sentence of 60 Months is Necessary to Avoid Unwarranted Sentencing Disparities.

A fair sentence is one that reflects not only the offense, but the offender. "Taking good works into account is entirely consistent with eliminating unwarranted sentence disparities."

*United States v. Mehta*, 307 F. Supp. 2d 270, 275 (D. Mass. 2004) (internal citations omitted).

Few defendants have the record of selfless good deeds and service to the community that Mr. Meek

has demonstrated throughout his life.

With respect to the offense conduct, defendants who engaged in conduct involving

receiving, transporting, or trading CSAM, frequently receive a sentence at the statutory minimum.

For example:

> *United States v. David Aidan Butler,* 1:22-CR-181-CMH. The defendant, like Mr. Meek, was convicted of transporting child pornography. He was convicted of transportation of child pornography. A subsequent search of his apartment revealed a large number of videos and images. Beyond this, the government recovered chat explicit conversations and alleged that the defendant believed he was speaking to a 15-year-old. This Court imposed a sentence of **60 months**, followed by 10 years of supervised release.

> *United States v. James Clager*, 1:19-CR-185-CMH. Defendant shared child pornography through a peer-to-peer program and used a search engine to find child pornographic materials online. ECF No. 25 (Statement of Facts). Defendant used sophisticated measures to avoid detection, such as virtual machines, encryption, and anti-forensic tools. *Id.* The defendant pleaded guilty to receipt of child pornography. The government argued that his guidelines range was 188 to 235 months and he should be sentenced accordingly. ECF No. 31. Mr. Clager was instead sentenced to **60 months**.

> *United States v. Kerry Sipult*, 1:18-CR-328-CMH. The government learned that the defendant had child pornography files available through a peer-to-peer program. ECF No. 6 (Statement of Facts). The government executed a search warrant, and found that the defendant downloaded the materials to his computer and transferred them to external hard drives. The government located 4,270 files of child pornography on the external hard drive alone. The defendant faced a sentencing range of 97-121 months, and the government sought a sentence at the low end of the range. ECF No. 13 at 2, 7. The Court sentenced Mr. Sipult to **60 months**.

*See also United States v. Singleton*, 2:16-CR-24 (sentenced to mandatory minimum of 60 months

in receipt of child pornography case, where the guidelines were 151-188 months); *United States v.*

*Goodson*, 2:11-CR-186 (sentence of 60 months, even though his guidelines were 151-188 months):

*United States v. Ceder*, No. 2:18-CR-66 (sentence of 60 months, with guidelines range of 151-188

months).

Even individuals whose cases involved aggravated circumstances received sentences that were close to the statutory minimum of 60 months. For example, in *United States v. Stuart Clay McDonald*, the defendant was convicted of one count of receipt of child pornography, and one count of possession. 1:22-CR-51-CMH, ECF 37. In that case, the government recovered multiple devices containing CSAM. But the government also uncovered evidence that the defendant engaged in disturbing conduct by taking inappropriate photos of a five-year-old child in his care:

> While the pictures do not constitute child pornography, the pictures are nonetheless concerning as they depict close-ups of the clothed child's buttock and genitalia. It is particularly concerning that the defendant took advantage of his friend's trust, and used the alone time he had with her daughter to take his own disturbing pictures of a five-year-old child.

Gov't Pos. on Sentencing, ECF 45, at 6. The Court imposed a sentence of **72 months**, followed by 10 years of supervised release.[10] Here, by contrast, there is no allegation or evidence here that Mr. Meek ever had improper physical contact with a child or that he sought to do so.

In *United States v. Bryson M. Miller*, 1:20-CR-200-CMH, the defendant was a repeat offender, having previously been convicted of possessing and receiving child pornography in 2006

---

[10]    *See also United States v. Imparato*, 1:19- CR-173-LMB (defendant, a college student, downloaded child pornography from the Darkweb, solicited child pornography through Kik messenger app, distributed child pornography on this app, engaged in sexually explicit communications with minors on the app, used the app to meet a 12- year-old boy with whom he engaged in oral sex and anal sex, had subsequent contacts with the victim, and created child pornography of the victim. ECF No. 47. Sentenced to **60 months concurrently** for the traveling to engage in sexual conduct with a minor, and distribution of child pornography); *United States v. Christopher Michael Williams*, 4:17-CR-109-HCM (defendant admitted to receiving child pornography and engaging in hands-on sexual contact with minors, including his girlfriend's grandson on five occasions, ECF No. 28 at 4, admitted to photographing a child's bare buttocks and placing his erect penis beside the child in the photo. Defendant's girlfriend stated that she found photographs of another child on defendant's phone, depicting the five-year-old child's clothed crotch and leg area. *Ibid.* Defendant's guidelines were 262 to 327 months, restricted to 240 months, *Id.* at 2, based on the child pornography images that were found on his devices. Despite the fact that defendant himself took an obscene photograph of a sleeping child and admitted to sexually abusing children, he was sentenced to **72 months**, followed by 15 years of supervised release).

and dishonorably discharged from the military as a result. Miller downloaded child pornography from the Darkweb using multiple devices. ECF No. 34 (Statement of Facts). Miller pleaded guilty to receipt of child pornography. In addition to this, Miller also failed to update his sex offender registration, as required by law, and pleaded guilty to that charge as well. This was particularly troubling because he worked at a martial arts studio where he had contact with children. In light of these aggravating facts, the Court imposed a sentence of **84 months**.

By contrast, Mr. Meek is a first-time offender who did not engage in enticement, production, or physical contact with any minors, nor did he knowingly or intentionally engage with minors over the internet. A sentence of 60 months is appropriate and consistent with the other sentences imposed for such conduct.

## V.     The Consequences of Mr. Meek's Criminal Conduct Have Been Swift and Severe.

Mr. Meek has already been subject to significant punishment for his offense. He does not argue that this punishment is undeserved; in fact, he has repeatedly expressed the recognition that he needs to be punished for his offense. Instead, because these factors bear on issues such as just punishment and the need for deterrence, they should be factored into the sentence imposed. Indeed, [i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *United States v. Stewart*, 590 F.3d 93, 141-142 (2d Cir. 2009). We respectfully submit that what Mr. Meek has undergone up until this point constitutes significant punishment that should be factored into the sentence imposed by the Court, specifically:

### A. Over six months of pretrial confinement in a lock-down unit.

Mr. Meek has been in custody continuously since his arrest on January 31, 202—a period of nearly eight months. For over six and a half months of that time, Mr. Meek was housed in a "lock-down unit," in which he was confined to his cell 22 hours a day. Mr. Meek was not placed

on a lock-down because of the nature of the offense, or "disciplinary" because he committed any infractions; he was placed there because his case was "high profile" and was the subject extensive media attention at the time of his arrest. Ironically, this media attention was the result of Mr. Meek's long and distinguished journalism career.

The Supreme Court has long recognized that pretrial confinement should not be for an excessive period of time, nor punitive in nature, *see, e.g., Hudson v. Parker*, 156 U.S. 277 (1895). Yet, in some cases–including this one–pretrial confinement is significantly more punitive than incarceration in the Bureau of Prisons. In such cases, it is important to account for this fact, which is a valid sentencing consideration under § 3553. *See, e.g., United States v. Pressley,* 345 F.3d 1205, 1219 (11th Cir. 2003) (remanding to district court with instruction to determine whether to depart on the ground of harshness of pretrial confinement).

### B. Collateral consequences of conviction.

We also ask this Court to reflect in its sentence what we already know to be true from human experience: that punishment (and its deterrent effects) can come in many forms, and not from incarceration alone.

The Fourth Circuit has held that consequences such as the defendant's loss of his career and livelihood were important because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment." *See, e.g.*, *Pauley*, 511 F.3d at 474-75. Accordingly, in determining whether a term of incarceration beyond 60 months is necessary, we urge the Court to consider *all* of the punitive aspects of Mr. Meek's conviction.

Mr. Meek's "actions have shattered his professional reputation, caused grave scandal to his family, and caused many friends to abandon him." Ex. 1 at 7-8—Letter of Col. M. Mitchell. On a professional level, his conviction has been devastating. Mr. Meek has lost the trust and credibility that he worked to earn over the course of his entire career. Instead of being known as an acclaimed

investigative journalist, Mr. Meek has been publicly marked for life as a felon and a sex offender. Mr. Meek's conviction, and the details of his offense have been widely publicized in the media, and will haunt Mr. Meek and his family, including long after his mortal life. *Stewart*, 590 F.3d at 141 ("the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant."); *see also United States. v. Smith*, 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive.").

To be sure, Mr. Meek recognizes that these consequences are entirely his fault, and has accepted them in a manner that reflects his recognition that they are fully deserved. As noted, before this investigation ever became public, Mr. Meek sought to have his name removed from the bestselling book he co-authored, declined to accept a prestigious award, and resigned from his position at ABC News. Ex. 1 at 9—Letter of Rev. K. Day ("James' character includes someone who chose to step away from his career, a significant book deal, recognition from the Foley Foundation, and to distance himself from personal and professional contacts to avoid bringing harm and embarrassment to others, as opposed to using those various platforms for his advantage as accountability became inevitable. These steps isolated him and had a significant negative impact on his finances, career, and future.").

We respectfully ask here that the Court consider the punitive and deterrence aspects of Mr. Meek's conviction in determining a just sentence.

## VI.     Restitution.

The defense will request at sentencing to continue restitution by 90 days in an effort to resolve the restitution requests, and which require at a minimum an amount of $3,000 per victim. Mr. Meek will have to pay special assessments of $5,000 per count. As reflected in the PSR, Mr. Meek has significant debts—including those that he has been unable to pay to support his children

during the pendency of this case.  Accordingly, he will seek to resolve issues relating to restitution after his sentencing.

## CONCLUSION

For all of the foregoing reasons, and those presented at the sentencing hearing, this Court should impose a sentence of 60 months.

Respectfully Submitted,

By: /s/ *Eugene V. Gorokhov*
Eugene Gorokhov, Bar No. 73582
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1750 K Street NW, Suite 300
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document VIA ECF which provides a copy to the AUSA of record. Exhibit 2, filed under seal, has been provided to the government by email.

By: /s/ *Eugene V. Gorokhov*
Eugene Gorokhov, Bar. No. 73582
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1750 K Street NW, Suite 300
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com